PLOTKIN, Judge.
This appeal arises from a medical malpractice action brought by appellant, John R. Herron, Sr., against Pendleton Memorial Methodist Hospital (Methodist). Defendant/appellee initially pled prescription, but the trial court refused to rule on that issué pretrial. After the plaintiff had presented his case in chief at a jury trial, Pendleton urged its exception of prescription or, alternatively, a directed verdict. The trial court sustained the exception of prescription. We reverse and remand.
The facts as revealed by the pleadings and the record are as follows:
Mr. Herron saw Dr. Maumus, his treating physician, on September 29, 1983, in anticipation of prostate surgery. In the hospital record of Mr. Herron’s history, Dr. Maumus noted his patient’s symptoms other than the prostate complaints:
(t)his 65 year old man, who has a long history of uncontrolled diabetes mellitus, who also has a history of arteriosclerotic cerebrovascular disease, was seen in the office during the past month prior to admission with uncontrolled diabetes. .... The patient also states that he has had some confusional episodes over the past month_ The patient has a number of medical problems as an adult, including ... cerebrovascular insufficiency, diabetes mellitus, hypertension, exogenous obesity. The patient complains of burning sensation involving *345 the left arm and left leg. Some minimal weakness is noted on this side.
On October 10, 1983, Dr. Norman Galen performed prostate surgery on appellant at Methodist Hospital. Mr. Herron began complaining of pain in his arms and hands as soon as he emerged from the recovery room according to testimony of his wife and daughters. His elbows were red immediately after the operation and twenty-four hours later became blue and bruised looking. Appellant’s daughter, Ms. Jeanette Gierlings, testified that she told Dr. Maumus on October 10 or 11 that her father’s elbows were painful and discolored and he responded, “(E)verything is going to be okay, don’t worry about it. It’s going to get better.” Appellant was released from Methodist October 16, 1983. He testified that he complained of his elbow discomfort to Dr. Maumus three or four times, both before and after his release from the hospital. Each time he was assured that his condition would improve.
Because of continuing pain in his arms and progressive numbness in the fingers on each hand, appellant saw Dr. Raeburn Llewellyn, a neurosurgeon, February 3, 1984. Dr. Llewellyn diagnosed ulnar nerve neuralgia, a condition in which the ulnar nerve is entrapped and damaged resulting in a loss of strength and sensation in the fourth and fifth fingers of each hand. The ulnar nerve damage, Dr. Llewellyn testified, may have been generated by “specific trauma” which occurred during Mr. Her-ron’s “operative exposure” but, the doctor noted, he would have to see some medical evidence presented in order to say that the operative exposure was the cause.
Plaintiff filed a medical malpractice action with the Insurance Commissioner on October 16, 1984. The alleged malpractice consists of Methodist’s failure to protect Mr. Herron from injury while he was under anesthesia. The trial court found that Mr. Herron should have been on notice that some thing unusual had happened on October 10,1983, the day of surgery, or at least by October 11 because at that time he was painfully aware of the condition of his arms.
La.R.S. 9:5628 which governs prescription in malpractice actions provides:
No action for damages for injury or death against any physician ... or hospital duly licensed under the laws of this state whether based upon tort, or breach of contract or otherwise, arising out of patient care shall be brought unless filed within one year from the date of the alleged act, ommission, or neglect, or within one year from the date of discovery of the alleged act, omission or neglect....
Appellant argues that the discovery date is February 3,1984, the day he saw Dr. Llewellyn, and realized the causal connection between his prostate surgery and his painful elbows. He contends that his case was filed timely, i.e., within one year of February 3, 1984.
In Cartwright v. Chrysler Corporation, 255 La. 597, 232 So.2d 285 (1970), the Louisiana Supreme Court held that an injured party does not need actual knowledge of the conditions to start the running of prescription as long as there is “constructive notice,” i.e., “whatever is notice enough to excite attention ... and call for inquiry.”
More recently, in Young v. Clement, 367 So.2d 828, 830 (La.1979), the Supreme Court declared:
(prescription does not run against one who is ignorant of the existence of facts that would entitle him to bring a malpractice action, as long as such ignorance is not willful and does not result from his neglect.
The plaintiffs in Young brought suit on November 20, 1975, for wrongful removal of healthy tissues and for blockage of the ureter. The initial operation occurred January 26, 1973, and a corrective procedure to open the ureter took place February 1, 1973. By July, 1975, the plaintiffs had actual knowledge of the cause of the blockage. The trial court found the plaintiffs had constructive knowledge after the February, 1973, surgery, even though they did not ask, “Why the blockage?”, and no one offered an explanation until July, 1975. The Court of Appeal affirmed the trial *346 court. The Supreme Court decided the case had not prescribed, reasoning:
(prescription does not run against one who is ignorant of the existence of facts which would entitle him to bring a malpractice action, as long as such ignorance is not willful and does not result from his neglect. Henson v. St. Paul Fire and Marine Insurance Co., 363 So.2d 711 (La.1978). Roy Young ... and his wife both had confidence in Dr. Clement, who had treated her since October of 1970. Mrs. Young had kidney trouble since she was eleven. She had been hospitalized and treated for urinary tract infections. Once she was hospitalized for pain in the kidney area very much like that suffered after the January 26, 1973 operation.... The record discloses no evidence that the Youngs should have suspected that the reason for the blockage of the ureter was a negligent stitch by Dr. Clement.... Young, 367 So.2d at 830.
Like Mrs. Young, Mr. Herron has had numerous physical problems and has demonstrated complete confidence in Dr. Mau-mus. Prior to admission to Methodist, Mr. Herron complained of a burning sensation in his left arm. At trial appellant testified that when Dr. Maumus told him that his arms would get better, “I believed my doctor. He’s a good doctor.”
The Supreme Court addressed this issue again in Cordova v. Hartford Acc. & Indent. Co., 387 So.2d 574 (La.1980), a case in which the trial court dismissed a medical malpractice claim on an exception of prescription and the Court of Appeal affirmed. The plaintiff in Cordova had a vasectomy and later suffered a loss of libido and the shrinkage of one testicle. The Supreme Court reversed, stating:
(t)he law does not impose upon a layman the obligation to self-diagnose a psycho-pathological condition which reproductive biologists themselves do not fully understand. Plaintiff had confidence in his physicians’ skill and judgment. The mere apprehension by plaintiff that “something was wrong” is not sufficient to start prescription unless plaintiff knew or should have known by exercising reasonable diligence that there was a possibility that his problem condition ... may have been caused by acts of malpractice. We are not prepared to charge plaintiff with such knowledge prior to June, 1976, when he became impotent and learned that he had virtually lost both testicles. Even if we were to impose a stricter standard of inquiry upon Cordova, i.e., his attention was or should have been excited and he was put on his guard when he noticed a sharp decline in his interest in sex, that knowledge was acquired shortly before April 7, 1976, within one year of his filing suit. Cordova, 387 So.2d at 577.
Herron, like Cordova, knew “something was wrong” but was not under an obligation to self-diagnose his condition. Like Cordova, Herron made inquiries about his problems but was not answered conclusively. In fact, Herron was assured his pain would disappear. Moreover, Mr. Herron is not as medically sophisticated as Cordova, and suffers from a plurality of physical problems, including “confusional episodes.”
Accordingly, we hold that appellant cannot be held to have constructive knowledge of his cause of action prior to the date of his discharge from the hospital and therefore, his suit was timely filed. To hold otherwise would be to obligate a patient still sedated with post-operative medications to deduce facts uncertain to his physicians. Both Young and Cordova hold that a high standard of medical knowledge is not imposed on a plaintiff. Because of Mr. Herron’s complicated medical history, his lack of sophistication and his periods of disorientation, he cannot be held to have understood the nature of his injury immediately after it occurred. For the foregoing reasons, the judgment of the trial court maintaining the defendant’s exception of prescription is reversed.
REVERSED AND REMANDED.