744 So.2d 112 (1999)
Maria ACOSTA
v.
Edward CAMPBELL, M.D., et al.
No. 98-CA-2538.
Court of Appeal of Louisiana, Fourth Circuit.
August 11, 1999.
*113 Lawrence S. Kullman, David A. Abramson, Lewis, Kullman & Sterbcow, New Orleans, Louisiana, Attorneys for Plaintiff/Appellant, Maria Acosta.
Harvey J. Godofsky, Mang, Batiza, Gaudin, Godofsky & Penzato, Metairie, Louisiana, Attorney for Defendant/Appellee, Edward M. Campbell, M.D.
Marilyn R. Cohen, Law Offices of Robert E. Birtel, Metairie, Louisiana, Attorney for Defendants/Appellees, Gerald M. Benoit, M.D., Jerry Richard Haskin, M.D., Helen Sauviac, CRNA, and Anesthesia East, Inc.
Lloyd W. Hayes, New Orleans, Louisiana, Attorney for Defendant/Appellee, David A. Femovich, M.D.
Deborah I. Schroeder, Mang, Batiza, Gaudin, Godofsky & Penzato, Metairie, Louisiana, Attorney for Defendant/Appellee, Pendleton Memorial Methodist Hospital.
*114 Edward J. Rice, Jr., Arthur F. Hickham, Jr., Adams and Reese, L.L.P., New Orleans, Louisiana, ATTORNEYS FOR Defendants/Appellees, Jan T. McClanahan, M.D. and Louisiana Medical Mutual Insurance Company.
Court composed of Judge JOAN BERNARD ARMSTRONG, Judge MIRIAM G. WALTZER and Judge PATRICIA RIVET MURRAY.
MURRAY, Judge.
Plaintiff, Maria Acosta, appeals the dismissal of her medical malpractice action on exceptions of prescription asserted by the defendant health care providers. We affirm.
On December 14, 1993, a radical mastectomy of the right breast was performed on Ms. Acosta by Dr. Jan T. McClanahan, a specialist in general and vascular surgery, followed by a breast reconstruction by Dr. David A. Femovich, a plastic surgeon, and his associate, Dr. Edward Campbell. Ms. Acosta complained of numbness and tingling in her lower right arm as well as loss of feeling in the ring and "pinky" fingers of her right (dominant) hand almost immediately after the surgery. Because of these complaints, her surgeons arranged for her to be seen by a neurologist. After an examination on December 17, 1993, this consultant informed Ms. Acosta that she had suffered a nerve injury to her lower right arm, probably due to pressure or compression during the surgery.
Ms. Acosta, who was discharged from the hospital on December 20, 1993, continued to see Dr. McClanahan, Dr. Femovich and Dr. Campbell for post-operative care throughout 1994. In January and March 1994 she consulted Dr. Thomas A. Krefft, a neurologist, about her nerve damage. On June 3, 1994, Ms. Acosta was examined and evaluated, at Dr. Femovich's request, by Methodist Gulf Coast Hand Center. Because she had a diminished ability to flex some of the fingers on her right hand, physical therapy was recommended and she was given a molded splint. Dr. Femovich and Dr. Campbell supervised the therapy treatments for Ms. Acosta's right arm and hand into the latter part of 1995.
Although aware that her symptoms were caused by a nerve injury that occurred during the mastectomy, Ms. Acosta alleges that Dr. Femovich advised her on December 14, 1994, for the first time, that her neurological injury might have been caused by improper positioning during surgery. Until then, she had been reassured that the injury was a "normal" consequence of swelling that accompanies that type of surgery.
In November 1995,[1] almost two years after her surgery, Ms. Acosta initiated a medical review panel proceeding, asserting that her claim was timely because she had not learned what caused her injury until December 1994. After considerable discovery, the defendant providers responded with these peremptory exceptions, maintaining that Ms. Acosta's claims had prescribed in December 1994, one year after she knew that she had suffered damages from the surgery.
The matter was submitted for decision by the trial court based only upon affidavits, deposition excerpts and other documentary evidence, without the testimony of any party. Following oral arguments, the district court maintained the exceptions and dismissed Ms. Acosta's claims against all defendants.[2]
*115 La. R.S. § 9:5628 A provides in pertinent part:
No action for damages for injury or death ... arising out of patient care shall be brought unless filed within one year from the date of the alleged act, omission, or neglect, or within one year from the date of discovery of the alleged act, omission, or neglect; provided, however, that ... in all events such claims must be filed at the latest within a period of three years from the date of the alleged act, omission or neglect.
This provision was enacted to codify the general one-year prescriptive period for delicts, as well as a limited application of the jurisprudential "discovery rule," for medical malpractice actions. Hebert v. Doctors Memorial Hospital, 486 So.2d 717, 723 (La.1986); Chaney v. State Through Dept. of Health & Human Resources, 432 So.2d 256, 259 (La.1983).
Accordingly, a malpractice claim brought more than a year after the alleged negligent act will be considered timely if filed within a year "from the date on which [the plaintiff] discovered or should have discovered the grounds for [her] cause of action," as long as it is asserted within three years of the conduct at issue. Whitnell v. Menville, 540 So.2d 304, 309 (La. 1989) (citing Hebert, supra).
Under the discovery rule, prescription is suspended until the plaintiff knows or should know of the damage, the wrongful act and the connection between them. Branch v. Willis-Knighton Medical Center, 92-3086, p. 1 (La. 4/28/94), 636 So.2d 211, 212. Thus, the one year prescriptive period does not begin to run against a plaintiff who is unaware of the facts upon which her cause of action rests unless her ignorance is willful, negligent or unreasonable. In re Medical Review Panel of Howard, 573 So.2d 472, 474 (La. 1991). In this case, the trial court found that Ms. Acosta had knowledge of sufficient facts underlying her cause of action to have made a claim within the first year after the surgery, and that the delayed filing, twenty-three months after her injury, was negligent or unreasonable.
Ms. Acosta first argues that the defendants have the burden of proving her claims have prescribed because her November 1995 petition specifically alleges that she was unaware of the cause of her injury until December 1994. She contends that because her action is thus not prescribed on the face of the pleadings, the burden remains on the exceptors to prove that her action was not timely. In support, she cites Chaney, supra, 432 So.2d at 259-60; Chandler v. Highland Clinic, 28,204, p. 2 (La.App. 2d Cir. 4/3/96), 671 So.2d 1271, 1273; Abrams v. Herbert, 590 So.2d 1291, 1295 (La.App. 1st Cir.1991); and Leyva v. Laga, 549 So.2d 914, 916-17 (La. App. 3d Cir.1989). Despite consideration of this jurisprudence, however, we find that under these circumstances, Ms. Acosta bears the burden of proving that she neither knew nor should have known the essential facts underlying her malpractice claims within one year of the alleged negligence.
In Chaney, the Supreme Court reviewed the dismissal of a malpractice suit based upon an exception of prescription that was "tried without introduction of evidence thereon." 432 So.2d at 258. The Court held that because the complaint was not filed until May 1981, the plaintiffs' causes of action arising from surgery performed in June 1977 were clearly barred by the three-year limit in R.S. § 9:5628, even though it was alleged that the facts were not discovered until 1979. Id. at 259. However, because the petition also alleged facts suggesting negligent treatment had been provided in 1978-79, which was undiscovered until January 30, 1981, the Court stated that this claim was "not prescribed on the face of the pleadings," and dismissal of this cause of action was erroneous. Id. at 259-60. There is no mention *116 in the opinion of either party's burden of proof.
Later, in Whitnell v. Menville, 540 So.2d 304 (La.1989), the Supreme Court was again called upon to decide an exception of prescription based solely upon the plaintiffs' allegations that although wrongful conduct in 1980 had caused their damages, their cause of action could not have been asserted until Mrs. Whitnell was diagnosed with cancer in 1985. Because these allegations were urged in the plaintiffs' briefs but were not included in their petition, the Court remanded for amendment, with specific instructions as follows:
If plaintiffs amend their petition and allege new facts, then the district court should consider anew the exception of prescription. At any evidentiary hearing on the exception the plaintiffs will have the burden of proving the grounds for any interruption of prescription which they allege in their amended pleading.

540 So.2d at 310 (emphasis added; citation omitted).
In this case, unlike Chaney, the exceptions at issue were not decided based solely upon the pleadings, but instead, as contemplated in Whitnell, upon evidence presented by all parties to support or controvert Ms. Acosta's claim that her delay in filing was reasonable. We, therefore, decline to follow the cited jurisprudence from the other circuits,[3] and hold that even though this petition includes allegations invoking the "discovery rule" as a defense to the running of prescription, the evidentiary burden was on Ms. Acosta to establish that the defendants' exceptions should be overruled.
Ms. Acosta next contends that by finding that she had sufficient knowledge to assert her claim within a year of the surgery, the district court committed legal error because the defendants failed to controvert certain essential facts underlying her claim that inaction was reasonable. Primary among the "uncontroverted" facts is that her treating physicians assured her that her condition was "a natural result/side effect of the surgery" and that they failed to disclose that it might have resulted from improper positioning rather than from swelling. Ms. Acosta argues that these facts are indistinguishable from those in Griffin v. Kinberger, 507 So.2d 821 (La.1987), and Herron v. Pendleton Memorial Methodist Hospital, 527 So.2d 344 (La.App. 4th Cir.), writ denied, 532 So.2d 770 (La.1988), and thus require that the exceptions of prescription be overruled.
Griffin involved a 1983 medical malpractice action in which the plaintiffs asserted that their child's eyes had been damaged in 1964 by the administration of oxygen for an excessive period after birth.[4] Although the eighteen-year-old mother inquired about the cause of her son's eye problems as early as 1965, she had been "consistently assured ... that this condition was a natural and expected consequence of the necessary administration of oxygen to premature children at birth." 507 So.2d at 822. Not until she read a news article in October 1982 did she seek a definitive diagnosis and discover that the condition was caused by excessive oxygen administration. On this evidence, the Supreme Court affirmed the overruling of the defendants' exceptions because the plaintiffs' delay was reasonable in the face of the doctors' repeated assurances that "the *117 symptoms were the normal result of necessary" treatment. Id. at 824. Ms. Acosta argues that even though she knew she had suffered an injury during her operation, she, like the plaintiffs in Griffin, had no reason to suspect that the injury was caused by negligence until she was informed of that possibility in December 1994. We disagree.
We have reviewed the evidence presented here in the light of our conclusion that plaintiff bears the burden of proof, and cannot say that the trial court erred, factually or legally, in finding that Ms. Acosta had sufficient facts to call for further inquiry prior to November 1994, one year before her claim was filed. We note that Ms. Acosta was a forty-one year old jewelry saleslady at the time of her surgery, while the mother in Griffin was eighteen years old and had only a sixth-grade education. Although Ms. Acosta contends that her three surgeons reassured her that the nerve condition "was a natural result of my surgery and was temporary," she does not allege that her neurologist, Dr. Krefft, similarly misled her with such reassurances. Significantly, Ms. Acosta has offered no rebuttal to Dr. Krefft's affidavit expressly denying that he ever told her that her condition could be the normal result of post-surgical swelling and stating that he advised her, in January and March 1994, that it was likely that she had suffered permanent damage from an injury to her ulnar nerve during surgery.
Rather than supporting Ms. Acosta's argument that she, like the plaintiff in Griffin, was reasonable in relying on her surgeons' "repeated assurances" that she had a normal, temporary condition, this evidence suggests that a reasonable patient would have questioned Dr. Krefft more closely, or asked for clarification as to causation, at least by the second examination in March 1994.
Similarly, we find Ms. Acosta's reliance on Herron to be misplaced. Like Ms. Acosta, the plaintiff in Herron demonstrated symptoms of nerve damage shortly after an operation, and was assured by his surgeon that the condition would improve. Mr. Herron, like Ms. Acosta, consulted a neurosurgeon who diagnosed a nerve injury resulting from trauma during the operation, although the exact causation was not identified. Unlike Ms. Acosta, however, Mr. Herron filed suit within one year of receiving this information. His suit, therefore, was held to be timely. Id. at 345. Although this Court found that Mr. Herron's reliance on his doctor's assurances was reasonable, and excused his failure to file his claim within one year of his surgery because he was not obligated to self-diagnose his condition, the facts and reasoning in Herron support the determination that, considering Dr. Krefft's diagnosis and treatment in January and March 1994, Ms. Acosta's ignorance of the facts underlying her claim was negligent or unreasonable. Although her surgeons' statements shortly after the operation may have led her to believe that her condition "was a natural result/side effect of the surgery" as she alleges, Ms. Acosta makes no claim that Dr. Krefft was similarly optimistic in his assessment as to the severity or duration of the injury. Furthermore, the fact that none of the physicians, including Dr. Krefft, informed her that the damage she suffered was caused by improper positioning or a specific act of malpractice, does not make her delay in filing suit reasonable. It is well established that neither express notice nor knowledge of the specific act of malpractice is required in order for prescription to begin to run. In re Claim of Aron, 96-2665, p. 3 (La.App. 4th Cir. 5/21/97), 695 So.2d 553, 556, and cases cited therein. Instead, "the proper focus is on the reasonableness of the tort victim's action or inaction" under the circumstances. Griffin, 507 So.2d at 824, n. 2. Considering the evidence presented in this case, Ms. Acosta did not carry her burden of proving that she neither knew nor should have known of the damage, the wrongful act and the connection between them until November 10, 1994, a year before her action was filed.
*118 In her final argument, Ms. Acosta cites In re Medical Review Panel for Claim of Brown, 97-2803 (La.App. 4th Cir. 7/1/98), 715 So.2d 1249, writ denied, 98-2020 (La.11/6/98), 728 So.2d 390, cert. denied, ___ U.S. ___, 119 S.Ct. 1356, 143 L.Ed.2d 518 (1999), and Wang v. Broussard, 96-2719 (La.App. 1st Cir. 2/20/98), 708 So.2d 487, writ denied, 98-1166 (La. 6/19/98), 720 So.2d 1213, to argue that prescription was interrupted by the fact that both Dr. Femovich and Dr. Campbell continued to treat the condition in her right arm and hand until shortly before she filed her claim.[5] Drs. Femovich and Campbell respond, however, that the "continuing relationship doctrine" is but an application of the third category of contra non valentum, as explained in the legal malpractice case of Lima v. Schmidt, 595 So.2d 624, 629-30 (La.1992). The defendants maintain, therefore, that Ms. Acosta would have to establish that they acted to prevent her from asserting her claim, as suggested in Rajnowski v. St. Patrick's Hospital, 564 So.2d 671, 674 (La.1990), in order to suspend or interrupt the running of prescription. Ms. Acosta concedes "that she has presented no evidence of any such intentional acts." She asserts that application of the doctrine is based upon a patient's natural reluctance to sue her treating physician(s). She argues, therefore, that an intentional act is not required for the doctrine to apply.
The suspensive effect of a continuing doctor-patient relationship is discussed in Taylor v. Giddens, 618 So.2d 834, 843 (La. 1993), as well as in the Brown and Wang opinions cited by Ms. Acosta. Notably, however, in each of these cases the doctrine was rejected as factually inapposite. Taylor at 843; Brown, 97-2803, p. 3, 715 So.2d at 1251; Wang, 96-2719, p. 8, 708 So.2d at 492. Moreover, in the earliest Louisiana case found to have mentioned the doctrine, Trainor v. Young, 561 So.2d 722, 726-27 (La.App. 2d Cir.), writs denied, 567 So.2d 1124, 1125 (La.1990), the defendant-physician's continued treatment of the patient was considered as but one of the factors relevant to determining "the reasonableness of the plaintiffs' failure to file the action within one year of the alleged negligent conduct." Ms. Acosta has not cited, nor has this court found, any medical malpractice case in which the prescriptive period was found to have been extended solely, or even primarily, because of a continuing doctor-patient relationship, as argued here.
Upon consideration of this jurisprudence, we do not find the continuing treatment doctrine applicable under the circumstances of this case. We have considered the alleged reassurances given Ms. Acosta by her surgeons, including Dr. Femovich and Dr. Campbell, in determining the reasonableness of her inaction. However, those reassurances are outweighed by the undisputed evidence that, at some point prior to November 1994, Ms. Acosta had sufficient knowledge to excite further inquiry into the nature, extent and cause of the nerve injury that occurred during the operation in December 1993. Therefore, the continued efforts by Dr. Femovich and Dr. Campbell to relieve and/or lessen the effects of the nerve damage did not act to suspend or interrupt the running of prescription.
For these reasons, we find the defendant-providers' exceptions of prescription were properly maintained and the plaintiff's claims dismissed with prejudice. Accordingly, the judgments are affirmed, with each party to bear its own costs.
AFFIRMED.
NOTES
[1] Ms. Acosta's initial complaint, submitted in proper person, was effectively filed on November 10, 1995 under La. R.S. § 40:1299.47 A(2)(b). Subsequent amendments, filed by her attorney in April 1996 and October 1997, did not affect the allegations relevant to the issue of prescription. In addition to her three surgeons, Ms. Acosta has sued the hospital where the surgery was performed, as well as the anesthesiologists, nurse anesthetists, and their employing firm.
[2] Only Pendleton Memorial Methodist Hospital's exception, filed after the other defendants' exceptions had been maintained, was decided without oral argument.
[3] The Third Circuit's 1989 Leyva case, like Chaney, was decided solely upon the pleadings. 549 So.2d at 916. Although the First Circuit decided Abrams in 1991, after the Supreme Court's Whitnell opinion, only Leyva and Chaney were referenced as authority regarding the burden of proof. 590 So.2d at 1295. Similarly, the Second Circuit cited Chaney, Leyva and Abrams in its discussion of this issue in Chandler. 28,204 at p. 2, 671 So.2d at 1273.
[4] Because the alleged malpractice occurred prior to the 1975 enactment of R.S. § 9:5628, the Griffin court focused only on the application of the one-year "discovery rule" that is at issue here.
[5] Ms. Acosta does not allege that any of the other defendant-providers continued to treat her for the injury in question, nor does she argue that prescription against the other providers could be suspended or interrupted by the ongoing relationship with her plastic surgeons. Accordingly, we are concerned here only with the timeliness of the claims against Drs. Femovich and Campbell.