798 So.2d 1041 (2001)
James E. TUCKER, Jr., and Lydia Tucker, et al.,
v.
Sarah G. LAIN.
James E. Tucker, Jr. and Lydia Tucker, Individually and on Behalf of their Minor Child, James Tucker, III,
v.
Sarah Lain, M.D., Humana, Inc., and Humedicenter, Inc., d/b/a Humana Hospital-New Orleans.
James E. Tucker, Jr. and Lydia Tucker, Individually and in their Capacity as Executor/Administrator of the Estate of their Minor Son, James E. Tucker, III,
v.
Sarah G. Lain, M.D.
Nos. 98-CA-2273, 2001-CA-0608 and 2001-CA-0609.
Court of Appeal of Louisiana, Fourth Circuit.
September 5, 2001.
*1042 Paul Rumage, Florence Bonaccorso-Saenz, The Law Office of Paul Rumage, New Orleans, LA, Counsel for Plaintiffs/Appellees.
Trevor G. Bryan, Carolyn O. Bryant, Bryan & Jupiter, New Orleans, LA, Counsel *1043 for Defendant/Appellant, Dr. Sarah G. Lain.
Peter E. Sperling, Frederick T. Greschner, Jr., Gary L. Hanes, Frilot, Partridge, Kohnke & Clements, L.C., New Orleans, LA, Counsel for Intervenor/Appellant, The Louisiana Patients' Compensation Fund.
Court composed of Judge MICHAEL E. KIRBY, Judge TERRI F. LOVE, and Judge MAX N. TOBIAS, JR.
Judge MAX N. TOBIAS, JR.
In this consolidated matter involving medical malpractice and wrongful death actions, the Louisiana Patient's Compensation Fund (the "Fund") appeals from a trial court judgment in favor of the plaintiffs, James E. Tucker, Jr. and Lydia Tucker, individually and on behalf of the Estate of their minor child, James E. Tucker, III ("James").
After becoming pregnant for the first time, Lydia Tucker, age 38 years, chose from her employer's health maintenance organization provider list Sarah G. Lain, M.D., an obstetrician/gynecologist, as her treating physician. Dr. Lain's medical practice was affiliated with Humana, Inc., and Humedicenter, Inc., d/b/a Humana Hospital ("Humana"). At the initial office examination on 8 January 1988, Dr. Lain discovered that Mrs. Tucker had a cervical polyp and recommended that it be removed. An ultrasound performed on 11 January 1988 disclosed that Mrs. Tucker was nine weeks pregnant and approximated 11 August 1988 as her due date. It also revealed a small uterine fibroid. Due to Mrs. Tucker's age and weight, Dr. Lain characterized her as a high-risk patient. Dr. Lain surgically removed the polyp without incident on 28 January 1988. The following months, Mrs. Tucker attended her regularly scheduled appointments with Dr. Lain on the following dates: 7 January 1988; 28 January 1988; 11 February 1988; 9 March 1988; 6 April 1988; 12 May 1988; 1 June 1988; 29 June 1988; and 13 July 1988.
In addition to her scheduled office appointments, on 23 April 1988, Mrs. Tucker went to Humana complaining of mild contractions. Humana's nursing staff attended to Mrs. Tucker and contacted Dr. Lain, who prescribed Brethine, a medication to deter premature labor. Two days later, on 25 April 1988, Mrs. Tucker returned to Humana complaining of pain. The nursing staff attached an electronic fetal monitor (EFM)[1] to Mrs. Tucker and reported to Dr. Lain by telephone that the fetus appeared well and not in distress.
On 27 April 1988, Mrs. Tucker underwent a pelvic ultrasound. T. Lamar Teaford, M.D., a diagnostic radiologist at Humana, interpreted the ultrasound and found the fetal cardiac activity and the amount of amniotic fluid were satisfactory. The placenta was normal, as well as the ratio of femoral length to abdominal circumference. Although the cephalic index measured 91.5, slightly above the normal range of 70-86, the head and body of the fetus were in proportion. The ultrasound also indicated a slight enlargement of the uterine fibroid.
Mrs. Tucker again went to Humana on 28 June 1988, complaining of cramps and fluid loss. The nursing staff conducted a sterile vaginal examination and nitrazine test, which indicated the lost fluid was not amniotic fluid. After reporting the results *1044 to Dr. Lain, the hospital discharged Mrs. Tucker.
On 13 July 1988, Mrs. Tucker, accompanied by her sister, Laura Clayton, went to her regularly scheduled appointment. She complained to Dr. Lain of lower abdominal pains and vaginal bleeding. The parties dispute whether Dr. Lain chose not to perform a vaginal examination at the time or whether Mrs. Tucker refused to undergo one. In any event, Dr. Lain never performed an examination and Mrs. Tucker returned home to rest. Later that evening, when her pains had not subsided, Mr. Tucker brought his wife to the hospital.
Medical records disclose that Mrs. Tucker arrived at the hospital's labor and delivery unit at 0030 hours or 12:30 a.m. on 14 July 1988. Pamela Dixon, R.N., a labor and delivery nurse, immediately attached a fetal monitor to Mrs. Tucker. She began a sterile vaginal examination and noticed that Mrs. Tucker was completely dilated and the fetus was in the birth canal. Nurse Dixon contacted Dr. Lain at 0035 hours or 12:35 a.m., reporting that Mrs. Tucker was completely dilated and the EFM strips indicated a decreased variability of the fetal heart rate. Dr. Lain arrived at the hospital at 0048 hours or 12:48 a.m. and immediately performed a sterile vaginal examination. Dr. Lain determined that Mrs. Tucker's membranes were still intact and proceeded to artificially rupture them. At 1:05 a.m., Nurse Dixon notified the neonatal intensive care and respiratory therapy units to attend the delivery. Dr. Lain delivered James at 1:23 a.m. on 14 July 1988. Because the infant appeared blue and was not breathing, the NICU nurses and respiratory therapists immediately started resuscitation procedures on him while Dr. Lain attended to Mrs. Tucker. Shortly thereafter, James was taken to NICU, where Juan Gershanik, M.D., a neonatologist, examined him. James' skull appeared elongated; he was able to suck and swallow on his own. He remained in NICU for several weeks, where he underwent several diagnostic procedures and was examined by numerous pediatric specialists.
During the months following the birth, Mr. and Mrs. Tucker learned that, in addition to a skull deformity, their son had sustained severe brain damage, resulting in total blindness, cerebral palsy, paraplegia, renal failure, pulmonary failure, hearing loss, among other complications. On 12 September 1989, they filed a request for a medical review panel pursuant to La. R.S. 40:1299.41, et seq., the Medical Malpractice Act, alleging that Dr. Lain and Humana were negligent in providing obstetrical care to Mrs. Tucker, which resulted in severe injuries to James. The medical review panel convened and found that neither Dr. Lain nor Humana had breached the applicable standard of care.
Following the adverse decision, the Tuckers filed suit in Orleans Parish Civil District Court on 19 July 1991, naming Dr. Lain and Humana as defendants. In November 1995, the Fund notified the plaintiffs that Dr. Lain was qualified under the Medical Malpractice Act only as a gynecologist, not as an obstetrician. In July 1996, the plaintiffs filed a motion in limine and asked for a pre-trial determination of Dr. Lain's status.
In March 1997, just days before the trial, the Fund petitioned to intervene in the suit, asserting that Dr. Lain's misrepresentations on her application for qualified health care provider status necessitated allowing the Fund to defend against liability at trial. The trial court denied the petition and ruled that Dr. Lain was a "qualified health care provider" and the plaintiffs' claims were covered under the Medical Malpractice Act. The defendants *1045 also raised an exception of prescription, which the trial court denied.
After an eight-day trial, the jury found Dr. Lain solely at fault for the plaintiffs' physical, mental, and emotional injuries, and awarded a total of $530,000.00 in damages. The trial court on 17 March 1997 entered judgment in accord with the verdict against Dr. Lain and the Fund, limiting their liability to $100,000.00 and $400,000.00, respectively, and dismissed all claims against Humana. The judgment also awarded interest, costs, and expert fees, and reserved the plaintiffs' rights to seek future medical benefits from the Fund. After rendition of the judgment, the Fund intervened and filed a motion for new trial and/or remittitur, which the trial court denied. Dr. Lain and the Fund suspensively appealed.[2]
On 3 June 1997, several months following the trial, James died. The Tuckers then filed a wrongful death suit against Dr. Lain, alleging their son's death arose from the injuries he had sustained at birth as a result of her negligence.
While the appeal in the medical malpractice action pended, the plaintiffs and Dr. Lain jointly moved this Court to remand the case to the trial court for a settlement approval. Following remand, the trial court, on 24 September 1999, approved a settlement agreement pursuant to La. R.S. 40:1299.44(C), wherein Dr. Lain, a self-insured health care provider, would pay the plaintiffs $100,000.00, admit liability in return for a release of all claims against her, and dismiss her appeal with prejudice. The plaintiffs reserved their rights against the Fund.
In view of the settlement in the medical malpractice suit, the plaintiffs filed a motion for summary judgment in the wrongful death case. The trial court rendered summary judgment against the Fund in the amount of $500,000.00, subject to a credit of $100,000.00 for the amounts paid by Dr. Lain, including interest from the date of the filing of plaintiffs' claim. The trial court also ordered the Fund to pay the plaintiffs' claims for future medical care and related benefits. The Fund appealed the granting of the summary judgment.[3] However, it failed to file a brief raising any assignments of error.[4] Thus, the appeal of the summary judgment in the wrongful death suit is abandoned and will be dismissed.
In appealing the judgment rendered in the medical malpractice suit, the Fund first assigns as error that the trial court erred in determining that Dr. Lain was a qualified healthcare provider under the Medical Malpractice Act where she misrepresented the scope of her medical practice to the Fund and failed to pay the surcharge assessed to practicing obstetricians.
The record discloses that Dr. Lain first enrolled as qualified health care provider under the Medical Malpractice Act in 1980 by procuring a policy of insurance with the Hartford Insurance Group and paying the proper surcharge. Dr. Lain's qualification lapsed in 1981. In 1982, she again qualified under the Act by procuring a malpractice liability insurance policy with Insurance Corporation of America ("ICA") and paying the assessed surcharge. Dr. Lain continued to qualify under the Act through *1046 1984 by maintaining her malpractice policy with ICA and paying the appropriate surcharges.
In 1985, Dr. Lain opted to qualify as a self-insured physician and completed a Physician Application Request for Quotation required by the Fund in order to assess the proper surcharge. On the application, Dr. Lain listed her "present specialty" as "OB-GYN." However, she omitted checking off the blank space adjacent to the listings "obstetrical deliveries" and "cesarean sections" to indicate that she was performing these high risk procedures. Based on Dr. Lain's submitted application, the Fund assessed her $597.00, the surcharge assessed to practicing gynecologists only. Dr. Lain paid the $597.00 surcharge and submitted adequate proof of financial responsibility as a self-insured health care provider. The Fund then issued a Certificate of Enrollment as a qualified, self-insured health care provider for 1985.
For the years 1985 through 1994, Dr. Lain paid the surcharge assessed to gynecologists and the Fund continued to issue annual Certificates of Enrollment, certifying her as a qualified health care provider. In 1995, the Fund learned that Dr. Lain was performing obstetrical procedures after several claims arising from obstetrical deliveries were filed against her. Thus, the Fund began assessing Dr. Lain the higher surcharge for greater risk obstetrical procedures; Dr. Lain's 1995 surcharge increased from $2,982.00 to $17,133.00.
La. R.S. 40:1299.42(A), relevant to Limitation of recovery, provides:
A. To be qualified under the provisions of this Part, a health care provider shall:
(1) Cause to be filed with the [Patient's Compensation Fund Oversight Board] proof of financial responsibility as provided by Subsection E of this Section.
(2) Pay the surcharge assessed by this Part on all health care providers according to R.S. 40:1299.44.
(3) For self-insureds, qualification shall be effective upon acceptance of proof of financial responsibility by and payment of the surcharge to the board. Qualification shall be effective for all others at the time the malpractice insurer accepts payment of the surcharge.
As a defendant in this medical malpractice case, Dr. Lain had the burden of proving her status as a qualified health care provider under the Medical Malpractice Act. See, Remet v. Martin, 97-0895 (La.App. 4 Cir. 12/10/97), 705 So.2d 1132. As a self-insured, Dr. Lain became qualified under the Medical Malpractice Act upon the acceptance of proof of financial responsibility by and payment of the surcharge to the Fund. The state treasurer verified Dr. Lain's proof of financial responsibility by issuing her a Certificate of Deposit after she deposited $125,000.00 in securities with the state treasurer. As evidence of the payment of the assessed surcharges, the Fund and the insurance commissioner issued Dr. Lain Certificates of Enrollment for the respective years. Each certificate stated that Dr. Lain was certified as a health care provider pursuant to La. R.S. 40:1299.41, et seq.; that securities valued at $125,000.00 were in the custody of the state treasurer; and, that all surcharges were paid for the indicated periods. Thus, Dr. Lain proved that she was a qualified health care provider under the Medical Malpractice Act.
In Brown v. St.Paul Fire & Marine Insurance Co., 31,777 (La.App. 2 Cir. 3/31/99), 731 So.2d 953, Rel L. Gray, M.D., treated the plaintiff in the emergency room at Lincoln General Hospital. The *1047 plaintiff later filed a medical malpractice claim with the Fund, alleging injuries as a result of Dr. Gray's negligence. The Fund denied coverage, claiming that Dr. Gray was not a qualified health care provider because he had not paid the surcharge for an emergency room physician. Dr. Gray's malpractice liability insurer had paid the surcharge assessed to a family practice physician. Reviewing La. R.S. 40:1299.42, the Court concluded that the health care provider is only required to pay the surcharge and to provide proof of financial responsibility to qualify as a health care provider for all claims. The Court noted that pursuant to the statute the physician's insurer had the duty to collect the premium, assess the surcharge, and remit it to the Fund. If the surcharge assessed by the insurer was substantially lower than the amount required by statute, the Fund had a statutory remedy against the insurer, not Dr. Gray. Specifically, La. R.S. 40:1299.44(A)(3)(b) allowed the Fund to collect from the insurer the proper surcharge with penalties, legal interest and attorney's fees. Thus, the Court concluded the insurer's failure to pay the proper surcharge did not defeat Dr. Gray's status as a qualified health care provider under the Medical Malpractice Act.
Regarding self-insureds, La. R.S. 40:1299.44(A)(2)(e) and (f) provide that:
(e) The board shall collect the surcharge from health care providers qualified as self-insureds.
(f) The surcharge for self-insureds shall be the amount determined by the board in accordance with regulations promulgated under the Administrative Procedure Act [La. R.S. 49:950 et seq.] and in accordance with the rate set by the Louisiana Insurance Rating Commission to be the amount of surcharge which the health care provider would reasonably be required to pay were his qualifications based upon filing a policy of malpractice liability insurance. (Emphasis added).
However, unlike in Gray, supra, the Medical Malpractice Act does not provide the Fund with a specific remedy when a self-insured fails to remit the correct surcharge. Nonetheless, in the case of a self-insured health care provider, the Fund is likened to an insurer. Thus, the Fund's statutory duty to assess and collect the surcharge from a self-insured health care provider encompasses the duty to verify the accuracy of the information provided by that self-insured applicant for surcharge assessment purposes.
The principal purposes of the Medical Malpractice Act are to limit the liability of health care providers who qualify under the Act and to provide compensation to medical malpractice victims who have been injured by qualified health care providers. Prisk v. Palazzo, 95-1475 (La. App. 4 Cir. 1/19/96), 668 So.2d 415. Because the Medical Malpractice Act constitutes a special legislative provision in derogation of the general rights available to tort victims, the Act must be strictly construed. Sewell v. Doctors Hospital, 600 So.2d 577 (La.1992).
Here, Dr. Lain complied with the Act and "qualified" as a self-insured health care provider when the Fund accepted her proof of financial responsibility and her payment of the assessed surcharge. That Dr. Lain's remitted and accepted surcharge was not the surcharge assessed to obstetricians performing obstetrical deliveries cannot defeat her qualified status pursuant to the Act to the plaintiffs' detriment. Hence, we find no error in the trial court's finding that Dr. Lain was a qualified health care provider under the Medical Malpractice Act.
In its second assignment of error, the Fund argues that the trial court erred in *1048 determining that the plaintiffs' medical malpractice suit had not prescribed where they filed their claim more than a year from the discovery of the alleged malpractice and their son's injuries.
Actions for medical malpractice prescribe one year from the date of the alleged act of malpractice or within one year from the date of the discovery of the alleged act. La. R.S. 9:5628 A.
The one-year prescriptive period commences running on the date in which the injured party discovers or should have discovered facts upon which his or her cause of action is based. Whitnell v. Menville, 540 So.2d 304, 309 (La.1989); Acosta v. Campbell, 98-2538 (La.App. 4 Cir. 8/11/99), 744 So.2d 112, writ denied, 99-2651 (La.11/19/99), 749 So.2d 683.
In the instant case, the plaintiffs alleged that Dr. Lain breach the applicable standard of care in treating Mrs. Tucker during her pregnancy and through the birth of James on 14 July 1988. They further allege that Dr. Lain failed to administer proper care to their son immediately following his birth. However, they did not file their claim with the Medical Review Panel until 12 September 1989, more than a year after the alleged malpractice and their son's birth.
A review of the trial transcript indicates that Mrs. Tucker suspected that she had a potential claim for malpractice immediately after she gave birth to James. Specifically, Mrs. Tucker testified as follows:
Q. When did you first believe that Dr. Lain did anything wrong to cause your baby's injury?
A. During the time of birth and during the time that J.T., when I was in the delivery room and after J.T. was born because if something was wrong with J.T., I should have know way ahead of time.
Q. And you knew upon his birth that there was something wrong with him when he was born?
A. Right, right after he was born.
Furthermore, Mr. Tucker testified that, after leaving the delivery room while waiting to see his wife, a doctor from the hospital informed him that the baby had "problems."
The plaintiffs' testimony indicates that they discovered or learned of the alleged malpractice and their son's injuries on the day of his birth. At the very latest, prescription commenced to run within four weeks following James' birth, while he was still in NICU, and the nurses informed Mr. and Mrs. Tucker that they would need special training to care for him. Under these circumstances, the trial judge erred in concluding that the plaintiffs had timely filed their medical malpractice claim.
Nonetheless, the plaintiffs argue that the Fund is now precluded from asserting the prescription issue because the parties entered into a court-approved settlement pursuant to La. R.S. 40:1299.44(C), citing Rey v. St. Paul Fire & Marine Insurance Co., 95-0661 (La.App. 4 Cir. 11/16/95), 665 So.2d 109, writ denied, 95-3033 (La.3/22/96), 669 So.2d 1223.
This court held in Rey, supra, that whenever the health care provider's insurer (a self-insured in Dr. Lain's case) pays the statutory maximum$100,000.00 statutory liability is admitted and the Fund has no standing to raise the issue of prescription. In Rey, the plaintiff, prior to trial, agreed to settle his claim against the healthcare provider and its insurer for the statutory maximum. The Fund objected to the settlement on several grounds, including prescription. The trial judge, in approving the settlement, specifically provided in the agreement that the Fund *1049 could raise the issues it had set forth in its objections to the settlement, including prescription. The Fund then raised an exception of prescription, which the trial court sustained. The plaintiff appealed. This court reversed, specifically noting that the Fund is a legislatively created entity whose rights cannot be expanded beyond its statutory limitations, nor can its status be changed to that of a party litigant by language injected into a settlement agreement. Recognizing that the legislature provides very limited protection for the Fund and the potential for collusion among the litigants in negotiating settlements to the Fund's detriment, we stated:
Thus, although it appears on the face of the pleadings that Rey's claim is prescribed, there is nothing in the record to indicate collusion between the plaintiff and defendants. In the absence of a showing of collusion, the settlement agreement must stand even though the trial court suspects a lack of good faith on the part of the insurer. The trial court could have refused to approve the settlement but cannot protect the Fund by granting it standing to raise prescription. Rather, it is for the Legislature to determine whether additional rights should be given the Fund in order to provide it with greater protection against questionable claims.
Id., 665 So.2d at 111. Thus, the Fund was precluded from asserting prescription even though its rights to do so were reserved to it by the trial court.
In the instant case, while her appeal pended, Dr. Lain agreed to settle her claim with the plaintiffs for $100,000.00 and admit liability in return for the dismissal of plaintiffs' claims against her. Pursuant to La. R.S. 40:1299.44(C), the parties petitioned the court to approve the settlement and notified the Fund of such. The Fund objected to the settlement but never raised the prescription issue. The trial court approved the settlement agreement and dismissed the suit against Dr. Lain. The record before us reflects that plaintiffs' counsel withdrew $100,000.00 from the registry of the court, evidencing Dr. Lain's payment of $100,000.00 to the plaintiffs.
In view of the decision in Rey, supra, we conclude that the Fund is precluded from arguing that the plaintiffs' claims have prescribed, even though the plaintiffs testified that they knew more than one year before they filed their claim that James' injuries resulted from Dr. Lain's actions.
The Fund, in its third assignment of error, argues that the plaintiffs failed to prove a causal connection between Dr. Lain's breach of the applicable standard of care and the damages sustained by James. Specifically, it contends Jack Pruett, M.D., plaintiffs' expert witness in obstetrics and gynecology, testified at trial that Dr. Lain breached the standard of care required of practicing obstetricians, but failed to testify that the breach was the proximate cause of James' injuries. Notably, the Fund does not contest the jury's finding that Dr. Lain breach the standard of care or that James sustained injuries at birth or the amount of damages awarded.
In a medical malpractice case against a physician, the plaintiff must establish a causal connection between the physician's negligent treatment and the sustained injury. La. R.S. 9:2794; Martin v. East Jefferson General Hospital, 582 So.2d 1272 (La.1991). Cause-in-fact is usually a "but for" inquiry which tests whether the injury would not have occurred but for the defendant's substandard conduct. Cay v. State, DOTD, 631 So.2d 393 (La.1994). Causation is factual determination that should not be reversed on appeal absent manifest error. Housley v. Cerise, 579 So.2d 973 (La.1991).
*1050 Dr. Pruett testified that Dr. Lain breach the standard of care in failing to monitor more closely Mrs. Tucker's pregnancy after she first experienced premature labor. He also opined that Dr. Lain breach the standard of care when she failed to perform a vaginal exam on the 13 July 1988 when Mrs. Tucker complained of severe lower abdominal pains and bleeding. Regarding the delivery, Dr. Pruett concluded Dr. Lain breached the standard of care by ordering Nurse Dixon to apply fundal pressure to Mrs. Tucker to expel the baby from the birth canal and by failing to administer oxygen to Mrs. Tucker during delivery. On cross-examination, Dr. Pruett testified that he could not say whether Dr. Lain's actions were the proximate cause of James' injuries. Nonetheless, our review of the record discloses ample evidence to support the jury's finding that Dr. Lain's actions and admitted malpractice resulted in James' injuries.
Yves Lacassie, M.D., professor of clinical genetics at LSU Medical Center, testified that he examined James and determined that his impairment was not a genetic birth defect but rather the result of oxygen deprivation at birth. He characterized James' elongated skull as a secondary deformity and not a primary malformation.
Jonelle McAllister, M.D., a pediatric neurologist, testified that she examined James shortly after birth and noted the molding of his skull, necrotic area of the scalp, edema, motor abnormalities, and stiffness. She opined that James' condition was consistent with perinatal asphyxia.
Marlene Buis, M.D., a neonatologist, testified that she attended to James in Humana's NICU after his birth. She ordered several diagnostic tests, including cranial ultrasounds, CT scans, chromosomal analysis, corneal opacity tests, and bacterial cultures. A CT scan disclosed that James had sustained an infarct in the brain either in utero or during delivery. Dr. Buis also concluded that the molding of James' skull occurred during delivery.
James W. Keating, Jr., M.D., a radiologist, testified that he performed an ultrasound several hours after James' birth and concluded that the abnormal shape of his skull was caused by the delivery or synostosis, a genetic malformation of the skull bones. However, based on the results of a CT scan performed the following day, Dr. Keating determined the sutures of the skull were open, which indicated the skull deformity occurred during delivery. Another CT scan performed on 26 August 1988 disclosed bleeding in the brain, which evidenced a stroke related to the delivery. Dr. Keating concluded that James' brain abnormalities were caused by an interruption of the blood supply to the brain.
Henrynne A. Louden, M.D., James' pediatrician, testified that she first examined James in September 1988 and concluded that he suffered developmental delays and cerebral palsy secondary to brain damage. Dr. Louden opined that James' condition was permanent and referred him to the Soboloff Clinic and other pediatric specialists.
John Willis, M.D., a pediatric neurologist, testified that he examined James' medical records from the delivery and concluded that the brain injury was likely caused by the lack of oxygen or blood flow to the brain during birth.
Warren McKenna, Jr., M.D., an ophthalmologist, testified that he examined James in December 1988 at the request of Dr. Louden. He concluded James suffered from optic atrophy and probably cortical blindness, the loss of the brain's ability to interpret visual function. Shortly thereafter, Leo Happel, Ph.D., a neurophysiologist at LSU Medical Center, performed a *1051 "visual evoked potential" test, which confirmed Dr. McKenna's diagnosis of cortical blindness.
An appellate court may not set aside a jury's finding of fact in the absence of manifest error or unless it is clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989). Here, the jury observed many medical experts and fact witnesses, heard their testimony, and weighed the evidence before it. Reviewing the record, we find no error in the jury's finding that Dr. Lain's breach of the standard of care in treating Mrs. Tucker during her pregnancy and delivery was a cause in fact of the injuries sustained by James at birth.
Finally, at oral argument the Fund's counsel conceded that in the event this Court determines Dr. Lain was a qualified health care provider and affirms the trial court judgment, the plaintiffs are entitled to future medical care and related benefits under La. R.S. 40:1299.43. Thus, the Fund's fourth assignment of error will not be considered.
Accordingly, for the above reasons, in appeal 98-CA-2273, the judgment of the trial court rendered on 17 March 1997 in favor of the plaintiffs is affirmed. The appeal of the Louisiana Patient's Compensation Fund designated as 2001-CA-0608 c/w 2001-CA-0609 is dismissed.
AFFIRMED; APPEALED DISMISSED.
NOTES
[1] An electronic fetal monitor measures the fetal heart rate and the contractions of the mother. Obstetricians are trained to read and interpret the computer generated printouts ("strips") that may indicate fetal distress.
[2] 98-CA-2273
[3] 2001-CA-0608 C/W 2001-CA-0609
[4] This court issued an order on 6 July 2001, consolidating appeal 98-CA-2273 with appeals 2001-CA-0608 c/w 2001-CA-0609. The order further provided that all briefs in appeal 2001-CA-0608 c/w 2001-CA-0609 had to be filed no later than 16 July 2001.