MARION F. EDWARDS, Judge.
LPlaintiff, Diana Scott, appeals the judgment of the trial court that granted an exception of prescription in favor of defendants in her action for medical malpractice. For the following reasons, we affirm.

FACTS AND PROCEDURAL HISTORY

Plaintiff/appellant, Diana Scott (“Scott”), following a traumatic injury to her lumbar spine and two subsequent back surgeries in the 1990s, sought treatment from Dr. Deepak Awasthi, a neurosurgeon at Ken-ner Regional Medical Center (“KRMC”). Following an examination on October 2, 2000, Dr. Awasthi recommended to Scott that she undergo an L5-S1 interbody fusion and pedicle fixation. Scott informed Dr. Awasthi on November 27, 2000 that she wished to proceed with the surgical intervention. On that same date, Scott was presented |4with and signed two separate consent forms. One of the consent forms, entitled “PATIENT CONSENT TO TREATMENT — DISCLOSURE OF RISKS,” disclosed several potential outcomes of the surgery, including: “pain, numbness or paralysis, or clumsiness.” Scott underwent surgery on December 1, 2000, at which time pedicle screws and plates were placed on the right side and left sides at L5-S1.
On the day following the surgery, Scott complained of left leg pain, numbness, and left leg paralysis. A CT scan of the lumbar spine on that date showed that “The left L5 and SI screws appear to violate the spinal canal.” A second surgery was scheduled for December 2, 2000. On that date, Scott signed a consent form for the procedure, which indicated that her condition was “left-sided radiculopathy secondary to pedicle screw impingement.” In his operative report of December 2, 2000, Dr. Awasthi wrote that the pedicle screws on the left side were encroaching into the spinal canal and that he explained to Scott why removal of the screws was necessary.
In the days immediately following the surgery, Scott complained of weakness and other symptoms in the left foot and leg, leading her to “express grief’ over the outcome of her surgery. Prior to her discharge from Kenner Regional, Scott consulted with a pain specialist, Dr. Robert W. Irwin, with whom she complained of sharp shooting and throbbing pain on her left side. Scott was discharged from the hospital on December 8, 2000 with advice to receive home health care.
On December 18, 2000, following an appointment with Scott, Dr. Awasthi noted that a violation of Scott’s pedicles led to a “left-sided nerve root injury.” Scott was still experiencing weakness on her left side and relied on a walker for assistance. On January 29, 2001, Scott again visited Dr. Awasthi, and his notes |sfrom that date reflect that Scott continued to “have the neurological deficits on the left side related to the L5 and SI nerve roots, more so the L5 nerve root.”
Dr. Irwin wrote, following a visit with Scott on February 12, 2001, that a screw *1099 had become lodged in Scott’s sacral spinal canal, that it had been removed, and that Scott continued to have residual weakness of the lower extremity. In a “Spine Assessment Form” filled out by Scott on that same date, Scott indicated that she suffered constant leg and back pain following the surgery.
After a visit with Scott on July 16, 2001, Dr. Awasthi recounted in his notes the details of an MRI scan that he had ordered the previous week: “The MRI scan of the lumbosacral spine reveals postoperative changes on the left side with scarring around the nerve root as well as swelling of the nerve root at L5 on the left side.”
Scott continued to treat with both Dr. Awasthi and Dr. Irwin for a period through May 6, 2002, during which time she sustained her complaints of pain and discomfort. On her last visit to Dr. Awas-thi on May. 6, 2002, Scott complained of left-sided leg cramping and muscle spasms on the left side of the back and leg. On that same date, Dr. Awasthi informed Scott that the conditions from her surgery would likely be permanent. Scott contends that, prior to this date, she had been told that the nerves would regenerate.
Scott indicated that she wished to pursue having the right pedicle screw removed following a gallbladder surgery later in the month. In giving her medical history at Thibodeaux General Hospital prior to the surgery in May 2002, Scott indicated that she had sustained “permanent nerve damage to the left lower extremity with left foot drop.” Scott never returned to treatment with Dr. Awasthi following her gallbladder surgery on May 14, 2002.
lfiOn October 22, 2003, Scott filed a medical malpractice complaint against defendants, contending that she- was never informed that the pedicle screws had violated the spinal canal either before the second surgery or for the following two years and three months that she continued treatment with defendants.
Kenner Regional Medical Center thereafter filed an Exception of Prescription on September 30, 2004; the State of Louisiana, through the Board of Supervisors of Louisiana State University Agricultural and Mechanical College, on behalf of Dr. Deepak Awasthi, also filed an Exception of Prescription on October 6, 2004. Following a hearing on January 14, 2005, the trial court granted defendants’ exceptions of prescription. Scott timely filed the present appeal.

LAW AND ANALYSIS

In her sole assignment of error, Scott contends that the trial court erred in holding that her medical malpractice claim had prescribed because the defendants did not demonstrate that she knew or should have known that she suffered an injury as a result of the surgery.
An exception of prescription is a peremptory exception, which a defendant may raise at any time, including on appeal or after the close of evidence, but prior to its submission after trial.[1] LSA-C.C.P. art. 929 provides when a peremptory exception is pled prior to trial, the exception is tried and disposed of in advance of or on the trial of the case. LSA-C.C.P. art. 931 allows the introduction of evidence at the trial of all peremptory exceptions, except the objection of no cause of action. The trial court is not bound to accept as true the allegations of plaintiffs petition in its trial of the peremptory exception.[2] When evidence is introduced and evaluated at the *1100 trial of a peremptory exception, an appellate court must review the entire |7record to determine whether the trial court manifestly erred with its factual conclusions.[3]
LSA-R.S. 9:5628 provides, in relevant part:
A. No action for damages for injury or death against any physician, chiropractor, nurse, licensed midwife practitioner, dentist, psychologist, optometrist, hospital or nursing home duly licensed under the laws of this state, or community blood center or tissue bank as defined in R.S. 40:1299.41(A), whether based upon tort, or breach of contract, or otherwise, arising out of patient care shall be brought unless filed within one year from the date of the alleged act, omission, or neglect, or within one year from the date of discovery of the alleged act, omission, or neglect; however, even as to claims filed within one year from the date of such discovery, in all events such claims shall be filed at the latest within a period of three years from the date of the alleged act, omission, or neglect.
In Richardson v. Avondale Shipyards,[4] this Court held:
Delictual actions are subject to a li-berative prescription of one year, which begins to run from the day the damage or injury is sustained. La.C.C. Art. 3492(which contains the substance of and replaces former La.C.C. Arts. 3536(1) and 3537, repealed by Acts 1983, No. 173). In cases where the damage is not immediately apparent, however, “prescription begins to run from the time a reasonable person under similar circumstances would have become aware of both the tort and the damages.” Wilson v. Hartzman, 373 So.2d 204, 206 (La.App. 4th Cir.1979), writ denied, 376 So.2d 961.
In the present case, the trial court made the following findings of facts, as detailed in the court’s Reasons For Judgment:
Ms. Scott’s initial surgery took place on December 1, 2000. After this surgery, Ms. Scott complained of left foot paresthesia and weakness.... A CT-scan indicated “left sided pedicle screw was in the spinal canal.” ... Ms. Scott signed a consent form for the procedure which was described in the consent form as removal of left sided radiculopathy secondary to pedicle screw impingement. ... According to the operative note, Ms. Scott understood the reason this second surgery was required and wished to proceed.... This Court finds that Ms. Scott had sufficient knowledge to trigger the start of prescription when she signed this consent form on December 2, 2000.
1 ¡¡Further, this Court finds that at the latest, Ms. Scott had sufficient knowledge to trigger the start of prescription after her visit to Dr. Awasthi on May 6, 2002. At that time, she was told that the nerve damage would be permanent. Under either analysis, the plaintiff did not file her claim timely pursuant to La.Rev.Stat. § 9:5628(A).
(Exhibit references omitted.)
Scott contends, however, that she had never been informed while she treated with Dr. Awasthi that the L5 screw had actually gone into her spinal canal. Citing the case of Campo v. Correa,[5] Scott argues that left leg pain, paralysis, and loss of bladder control were risks of a properly performed surgery “as reflected in the consent form that petitioner signed before the first surgery performed by Doctor *1101 Awasthi.” Scott concludes that the development of those conditions did not constitute the discovery of neglect and that she timely filed her claims within one year of her discovery of the malpractice and within the three-year peremptory period.
In Campo, the Louisiana Supreme Court held that the date of discovery for the purposes of commencement of prescription, was not reasonably knowable by the plaintiff until examination by a doctor, other than the defendant, Dr. Correa, revealed that defendant’s use of medical hardware was improper. The court noted:
In the present case, the evidence is unrefuted that Dr. Correa specifically advised Campo before the lumbar surgery that both spinal fluid leakage and infection were possible complications which might be expected as a result of lumbar surgery. Likewise, Dr. Correa once again told the Campos post-surgery the infection and the CSF leak were expected complications of the surgery. Although neither of these conditions were definite to occur, they were nonetheless untoward results Dr. Correa prepared Campo to expect as commonly occurring.... Accordingly, we do not find it unreasonable for Campo to view these conditions as common risks of this surgery and further that these conditions alone were insufficient to arouse Campo’s suspicion that Dr. Correa had committed medical malpractice.
|9... In light of the conversations Campo and Dr. Correa had post-surgery, we do not find that Campo acted unreasonably in failing to recognize that his medical condition may have been related to Dr. Correa’s treatment and his hospitalization. To find otherwise would place an undue burden on Campo to have self-diagnosed the cause of his injury. The alternative argument that the defendants urge and the lower courts adopted, namely that Campo should have gotten a second opinion earlier than Dr. Billings’, is also without merit. Given the facts of the present case, the standard that the lower courts adopted would require a patient, who had belief and trust in his doctor, to nonetheless get a second medical opinion to confirm/refute the treating physician’s course of treatment. Such an approach would clearly undermine the doctor-patient relationship.[6]
Scott claims that she learned from Dr. Awasthi on May 6, 2002 that the conditions that had resulted from her surgery were likely to be permanent. Based on that information, Scott says that she then obtained her medical records in March of 2003, and it was only at that time that she learned that the screws had been drilled into her spinal canal. Scott’s request to convene a medical review panel came on October 17, 2003.
We agree, in part, with Scott’s contention that her case in many ways resembles Campo. Specifically, the symptoms of pain that manifested following Scott’s surgery were arguably anticipated by the consent form that Scott signed. Further, we do not find that Scott acted unreasonably in failing to recognize that her medical condition may have been related to Dr. Awasthi’s treatment. Accordingly, we disagree with the trial court’s finding that prescription commenced during Scott’s treatment with Dr. Awasthi.
As the trial court correctly noted, “[t]he date of discovery for determining when prescription commences under the discovery rule is ‘when a plaintiff obtains | inactual or constructive knowledge of facts indicating to a reasonable person that he or she is the victim of a tort.’ ”[7] The *1102 test for determining sufficient knowledge is:
[Wjhether the cause of action was known or reasonably ‘knowable’ by plaintiff... .When a plaintiff has knowledge of facts strongly suggestive that the untoward condition or result may be the result of improper treatment and there is no effort by the health care providers to mislead or cover up information which is available to plaintiff through inquiry or professional medical or legal advice, then the facts and cause of action are reasonably knowable to plaintiff.[8]
In the case of In re Medical Review Proceedings of Ivon,[9] the Fourth Circuit considered a similar issue of when a plaintiff received information sufficient to constitute discovery. In Ivon, the plaintiff underwent a biopsy for evaluation of an enlarged lymph node on her right neck. Following the procedure, the plaintiff presented to her treating physician with complaints of weakness in her shoulder and other problems; her doctor explained that the nerves were touched in the exploration of the neck area, which may account for her complaint. Ivon’s doctor referred her to a neurologist for evaluation. Seven days after her surgery, Ivon was informed by her neurologist that she had sustained nerve root damage. In granting the defendant’s exception of prescription, the trial court noted that Ivon had sufficient knowledge to excite further inquiry into the nature, extent, and cause of the nerve injury that occurred during the February 1997 lymph node biopsy. The Fourth Circuit, relying on its decision in Acosta v. Campbell,[10] upheld the trial court’s grant of prescription, finding that the record reflected that Ivon had sufficient knowledge that her nerve root injury had been caused by the initial surgery.
Inin the present case, the trial court made a finding of fact that Scott had sufficient knowledge to trigger the start of prescription after her visit to Dr. Awasthi on May 6, 2002. After a review of the record, we cannot say that this finding was manifestly erroneous. The record establishes that, although Scott’s medical records consistently reflect a nerve injury related to the initial surgery of December 1, 2000, Scott was expressly made aware of the nerve damage no later than May 6, 2002. As in Ivon, we find that the express disclosure of nerve damage to Scott provided sufficient knowledge or discovery to begin the running of prescription on her claim, which was not ultimately filed until over one year from the date of discovery and outside of the three-year prescriptive period from the date of the alleged act, omission, or neglect provided by LSA-R.S. 9:5628. Accordingly, the judgment of the trial court, granting defendants’ exceptions of prescription, is affirmed.

AFFIRMED.

. LSA-C.C.P. arts. 927 and 928(B).

. Bowers v. Orleans Parish School Bd., 95-2530 (La.App. 4 Cir. 5/29/96), 694 So.2d 967, 972.

. Id.

. Richardson v. Avondale Shipyards, Inc., 600 So.2d 801, 803 (La.App. 5 Cir.1992).

. 2001-2707 (La.6/21/02), 828 So.2d 502.

. Id. at 513 (footnote omitted).

. Citing Griffin v. Kinberger, 507 So.2d 821 (La.1987); In re Morgan, 98-1001 (La.App. 4 *1102 Cir. 12/16/98), 727 So.2d 536, writ denied, 99-0364 (La.4/23/99), 740 So.2d 643.

. In re Morgan, 98-1001 (La.App. 4 Cir. 12/16/98), 727 So.2d 536, 539 (omission as found in the original).

. 2001-1296 (La.App. 4 Cir. 3/13/02), 813 So.2d 532, writ not considered, 2002-1055 (La.6/7/02), 818 So.2d 764.

. 98-2538 (La.App. 4 Cir.1999), 744 So.2d 112, wtit denied, 99-2651 (La. 11/19/99), 749 So.2d 683.