561 So.2d 722 (1990)
Franklin J. & Theo Elaine Benedict TRAINOR & Lisa Elaine Trainor, Plaintiffs-Appellants,
v.
Bennett H. YOUNG, et al., Defendants-Appellees.
No. 21180-CA.
Court of Appeal of Louisiana, Second Circuit.
May 9, 1990.
Rehearing Denied June 14, 1990.
Talbot, Sotile, Carmouche, Marchand & Marcello, Donaldsonville by Victor L. Marcello, for plaintiffs-appellants.
Cook, Yancey, King & Galloway, Shreveport by Herschel E. Richard, Jr. and Cynthia C. Anderson, for defendants-appellees Dr. Young and Hartford Acc. & Indem. Co.
Mayer, Smith & Roberts, Shreveport by Caldwell Roberts, for defendants-appellees, Willis-Knighton Hosp.
Before HALL, C.J., and MARVIN, JONES, SEXTON and HIGHTOWER, JJ.
MARVIN, Judge.
In this medical malpractice action that arose out of the implantation of a metal rod in the spine of a 10-year-old girl afflicted with scoliosis, the parents, who initially instituted the action, and their daughter, Lisa, who became a party plaintiff after reaching the age of majority, appeal a judgment sustaining defendants' exceptions of prescription.
After the rod was implanted by a Shreveport surgeon in mid-1974, Lisa developed paralysis in her lower extremities and became incontinent. The rod was removed by *723 a Houston surgeon October 3, 1975. The action was filed October 1, 1976.
Plaintiffs effectively have alleged or argued here and below that Dr. Young, the Shreveport orthopedic surgeon who implanted the rod, was negligent because he did so without first doing a myelogram [a fact known to plaintiffs in 1974] and because he implanted the rod in areas of the spine that he should have recognized were afflicted with spina bifida and diastematomyelia [a fact not known to plaintiffs before the rod was removed on October 3, 1975].[1]
The trial court noted that plaintiffs learned shortly after the surgery and paralysis occurred in 1974 that Lisa had diastematomyelia and that a neurologist "felt she had a vascular injury." The trial court mentioned the history that Lisa's parents gave the Houston doctor in mid-October 1974 and concluded that "it is unreasonable to believe that [plaintiffs] were [then] ignorant of the facts upon which their cause of action is based, that being the surgery performed by Dr. Young without first having a myelogram."
The trial court's conclusion fails to consider that Lisa continued under the care of Dr. Young until June 17, 1975, and that plaintiffs did not suspect until after the October 3, 1975, Houston surgery that Dr. Young had "hooked" the rod to vertebrae which he should have recognized during the operation were afflicted with either or both spina bifida and diastematomyelia.
Under these circumstances, we must find the trial court erred in sustaining the exceptions of prescription to the action that was filed October 1, 1976, within the year after the Houston surgery. Whitnell v. Menville, 540 So.2d 304 (La.1989).
Reversing the trial court, we render judgment overruling the exceptions of prescription.

DISCUSSION
Lisa Trainor, born in January 1964, was six months old, when her orthopedic surgeon, Dr. Young, determined that she had congenital scoliosis (curvature of the spine) and began treating her. External support braces and other procedures used or suggested by Dr. Young did not prove successful and Lisa's scoliosis progressively worsened during the next decade.
About 10 years later, Dr. Young recommended surgery to implant a Harrington rod in her back to arrest and stabilize the progression of the spinal curve. Notwithstanding her condition, Lisa, before the operation, was able to walk and play with certain limitations and had experienced only intermittent numbness and tingling in her legs. Lisa's parents consented to the operation, which was done June 20, 1974.
While in recovery, Lisa complained of severe pains in her legs and developed stomach problems from the anesthesia. Her leg pain, which Dr. Young attributed to hypersensitivity, eventually abated, as Dr. Young predicted to Lisa's parents. Within 48 hours after the operation, however, both lower extremities became paralyzed and Lisa was incontinent.
To Lisa's parents, Dr. Young initially attributed the paralysis to "spinal cord shock" (and vascular myelopathy, or failure of blood supply), which he explained sometimes occurs following spinal cord surgery. He expected Lisa's condition to improve as the swelling from the operation diminished.
Following the operation Lisa remained in the hospital for five weeks, during which time Dr. Young consulted with other physicians, including Drs. Ashby, Brown and Medigan. Various diagnostic tests, including x-rays and a myelogram, were then conducted. These tests were initially interpreted as revealing proper placement and stability of the rod and no significant abnormalities. About a month after the operation *724 Dr. Young suggested diastematomyelia (which was found by Dr. Medigan) as a possible cause of the paralysis.
Neither Dr. Young nor the Shreveport consulting physicians suggested to plaintiffs that Dr. Young's surgery was somehow amiss or wrongly done. Dr. Young had been treating Lisa for over 10 years. Plaintiffs said they then had "much faith and trust" in Dr. Young, describing him as a "nice person to talk to" and a "fine doctor."
In the weeks and months after the operation, Lisa's paralysis showed some, but minimal, improvement, only in her right leg.
One of Lisa's aunts told Lisa's mother of a Houston scoliosis specialist, Dr. Wendell Erwin. Lisa's parents discussed with Dr. Young what they had been told about the specialist and their desire for "another opinion" about a bone spur mentioned by Dr. Young. Dr. Young arranged their appointment with Dr. Erwin and sent him Lisa's medical records, x-rays and diagnostic test reports. Dr. Erwin saw and hospitalized Lisa in Houston in mid-October 1974 and thereafter. He conducted additional diagnostic tests and consulted with Houston neurologists, including Dr. Joe Robertson, who died before the hearing on the exceptions of prescription.
Dr. Erwin thereafter reported periodically to Dr. Young, sending him the results of the Houston examinations and tests, and medical reports and suggestions for Lisa's treatment in January and in March 1975. In March 1975, Dr. Erwin wrote Dr. Young that he was considering exploratory surgery and noted that Lisa's parents were hesitant about agreeing because of "added risks." Dr. Young continued to treat Lisa through June 17, 1975.
In August 1975, a pre-surgical examination and report by one of Dr. Robertson's associates noted some slight improvement in Lisa's condition and suggested surgery to "re-explore the spine, remove the bony spurs and do a fusion."
On October 3, 1975, Dr. Erwin performed the exploratory surgery in Houston. He excised several bony spurs in two areas of diastematomyelia, and "mended" or fused some vertebrae in Lisa's spine in areas above and below where Dr. Young had fused. He reinforced the fusion that Dr. Young did in 1974, noting that Dr. Young's fusion was "weak." He noted that diastematomyelia was present at the T-6, 7 and 8 vertebrae. He found a small area of diastematomyelia and spina bifida at the T-12L-1 area. He also found the Harrington Rod installed by Dr. Young to be "serving no purpose. It was a very short three-hook construct at the apex of her curve, which did not extend over a very extensive area, and it really was not offering anything in terms of holding power."
Obviously not aware that Lisa ceased seeing Dr. Young on June 17, 1975, Dr. Erwin continued to send reports and make suggestions to Dr. Young about Lisa's further care.
According to Lisa's mother, Dr. Robertson told the parents in Houston in mid-October 1974:
that [Lisa] had diastematomyelia, ... and the bone spur was in effect nailing her spinal cord in place and that with the Harrington rod pulling on her spinal column, that [the rod] could be putting pressure on the spinal cord and causing the paralysis ...
He said that the rod needed to be removed and that the bone spur had to be removed, and that this would alleviate the pressure on [Lisa's] spinal cord.
In a 1987 deposition Dr. Erwin testified that he was not asked and did not "investigate" to determine whether Dr. Young's implantation was negligently done. He said he would have advised the parents had they asked and if he had then known the answer to any question about malpractice, but emphasized that he was not asked and did not know the answer. He said that Lisa's parents gave him this history in mid-October 1974:
In June 1974 [Lisa] had had scoliosis and developed a paralysis ... subsequently noted to have a diastematomyelia... said a neurologist felt she had a vascular injury ... [and they] were concerned *725 as parents ... trying to rectify the problem ...
In its reasons for sustaining the exceptions of prescription, the trial court emphasized what plaintiffs learned from Dr. Young and from Drs. Erwin and Robertson in Houston in 1974. What plaintiffs learned after the October 3, 1975, Houston operation, however, is more important.

MEDICAL SUMMARY
Through October 1974 five doctors gave no less than seven possible hypotheses as to the cause of Lisa's paralysis. None suggested that Dr. Young perhaps improperly implanted the rod. The reports of the other doctors were written to Dr. Young, who reported some of their content to plaintiffs.
Dr. Young (1) suggested "spinal cord shock," then vascular myelopathy, and later diastematomyelia and a bone spur.
Dr. Ashby (2) (June 26, 1974) suspected a hematoma or some direct pressure from the compression plate (Harrington Rod) or "some underlying pathology relating to the widening of the spinal canal below the rod." This "widening" was later identified as diastematomyelia.
Dr. Medigan (3) (July 16, 1974) suggested vascular myelopathy or a "possible" bone spur at T-12 that might be diastematomyelia. This possibility was initially discounted after a radiologist's myelographic report did not confirm the suggestion.
Dr. Brown (4) (July 6, 1974) noted that electromyographic findings "were compatible with ... vascular myelopathy," but suggested that some type of congenital cord anomaly "might" have been disrupted during the surgery. On the basis of the myelogram report, Dr. Brown ruled out compression from the rod as a cause. The myelogram report was later determined to be inaccurate. Dr. Brown concluded that his observations were only conjectures and that the precise cause of the paralysis would probably remain an "enigma."
In mid-October 1974 Dr. Robertson (5) found that Lisa had diastematomyelia and opined that the pull of the rod on the spinal column resulted in the bone spur "nailing" her spinal cord in place and causing the paralysis.
In a 1987 deposition Dr. Erwin said he examined the post-operative x-rays sent him by Dr. Young in 1974 and found two areas of diastematomyelia (T-6 through T-8, T-12) and a spina bifida (T-12), which perhaps Dr. Young had not found or recognized during his 1974 surgery. Dr. Young asked that the x-rays (or photographs thereof) that showed this be returned to him for his further examination.
At this juncture, we note that an x-ray report to Dr. Young in 1969 informed him that Lisa had spina bifida occulta in the upper lumbar segments. Nothing in this record suggests that anyone told plaintiffs before the October 3, 1975, Houston operation that Dr. Young might not have seen or discovered what he should have during his 1974 operation and that he should have avoided attaching the rod to suspect vertebrae.
Dr. Erwin did not mention anything to plaintiffs about Dr. Young's surgical implantation technique, saying they did not ask and he did not know, and that Dr. Young was in the best position to know what happened during surgery and why.
Dr. Erwin said he did not think that Dr. Young's failure to perform a pre-operative myelogram, the diastematomyelia, or the rod "caused" the paralysis, but said that he was "suspicious" about the rod having been hooked to an area afflicted with spina bifida, an area that should have been avoided and the area where Lisa apparently bled excessively during Dr. Young's surgery.
Dr. Erwin explained that the "concern" of Lisa's parents when they saw him in mid-October 1974 was to correct or relieve Lisa's paralysis. He said: "They ... didn't anticipate their daughter would be paralyzed after surgery ..." Plaintiffs told Dr. Erwin in mid-October 1974 that "in June of 1974 [Lisa] had scoliosis surgery and developed a paralysis. A week after surgery a myelogram had been done and [she was] subsequently noted to have a diastematomyelia ... [They said] a neurologist felt she had a vascular injury." *726 Dr. Robertson's advice to plaintiffs in mid-October 1974 that the "rod needed to be removed and that the bone spur had to be removed and that this would alleviate the pressure on the spinal cord," does not imply that Dr. Young might have improperly attached the rod to a vertebra to which it should not have been attached.

TRIAL COURT'S REASONS
The trial court mentioned in its reasons that Lisa and her parents were aware that:
a myelogram had not been conducted before surgery, but was done approximately one week thereafter ... they were ... aware that a dramatic and catastrophic event had occurred during surgery by Dr. Young ... [A]t least by October 1974 after Lisa was taken to Dr. Erwin and Dr. Robertson, they were well aware that they might have a cause of action against Dr. Young ... [and] were reasonably alerted ... [by] Dr. Robertson... [that] the possible cause of the paralysis was the insertion of the Harrington Rod and the attendant pressure of bone spurs against the spinal cord.
On or before October 1974 Lisa and her parents knew only that Lisa had diastematomyelia and a bone spur and that the Harrington Rod could be putting pressure on the spinal cord and causing the paralysis.
The evidence ... reflects that it is unreasonable to believe that they were ignorant of the facts upon which their cause of action is based, that being the surgery performed by Dr. Young without first having a myelogram.

If plaintiffs' cause of action was solely based on Dr. Young's failure to perform a myelogram before the 1974 surgery, we might agree with the trial court. In this vein, we also note that plaintiffs do not suggest, as the trial court did, that it was negligence to implant the Harrington Rod in Lisa's spine in an attempt to correct scoliosis. Implanting of a Harrington Rod apparently was and is a recognized procedure to correct scoliosis in certain cases.
The allegations and argument of plaintiffs, in our appreciation, suggests that Dr. Young was perhaps negligent not only in failing to perform a pre-operative myelogram, but in failing to discover the afflicted vertebrae during the operation and in how and where he attached or "hooked" the rod to Lisa's vertebrae. It was only after Dr. Erwin's October 3, 1975, operation and perhaps only after plaintiffs brought their action on October 1, 1976, that plaintiffs discovered facts indicating that Dr. Young might have been negligent in that respect during the operation.
Before October 3, 1975, the Houston doctors confirmed only what plaintiffs had learned in 1974 from the hypotheses of the Shreveport doctors: "diastematomyelia ... bone spur ... shock, loss of blood supply... spinal cord compression, perhaps caused by the surgical implanting of the rod ..."
Nothing, however, suggested, and no lay or medical person hinted, to plaintiffs before Dr. Erwin's October 3, 1975, operation that Dr. Young perhaps, possibly, or might have, failed to see what he should have seen during his 1974 operation or that he should not have "hooked" or connected the Harrington Rod to vertebrae that were possibly afflicted with diastematomyelia or spina bifida. We need not and do not determine at this juncture whether what Dr. Young did or failed to do during his 1974 operation constitutes malpractice. We determine here only the prescription issue on this record.

CONCLUSION
Under the circumstances of this record, the critical issue is the reasonableness of the plaintiffs' failure to file the action within one year of the alleged negligent conduct on June 20, 1974. Jordan v. Employee Transfer Corp., 509 So.2d 420, 423 (La. 1987).
Lisa last saw Dr. Young for treatment on June 17, 1975. Dr. Erwin continued to send Dr. Young reports of Lisa's condition and treatment even after then, believing that Dr. Young was still treating her. In these circumstances it is unreasonable to *727 require a patient to sue his treating physician while the physician-patient relationship continues. See Chaney v. State Through Department of Health, 432 So.2d 256, 258 (La.1983); Corsey v. State Department of Corrections, 375 So.2d 1319 (La.1979).
We are unable to deduce from this record whether the x-rays before October 3, 1975, clearly revealed to the doctors whether any of the vertebrae to which the rod was hooked were then afflicted with either spina bifida or diastematomyelia. The testimony on this point leaves much to be desired. In any event, plaintiffs knew much less than the doctors.
Notwithstanding that the thrust of plaintiffs' initial action emphasized Dr. Young's failure to have a pre-operative myelogram done, plaintiffs have later alleged and argued that Dr. Young was also negligent in failing to discover what he should have discovered during the operation and should have avoided hooking the rod to vertebrae afflicted with either or both spina bifida and diastematomyelia.
Where a plaintiff, after instituting a malpractice action that has prescribed on its face under one factual cause of action, raises and argues factual allegations of a "different" cause of action that is not facially prescribed, the sustaining of the exception of prescription will be reversed. Whitnell v. Menville, supra. The defendant pleading prescription must show that a plaintiff's asserted ignorance of the ultimate fact was willful, or the result of negligence or unreasonable inaction. See Whitnell, supra, and Henson v. St. Paul Fire & Marine Ins. Co., 363 So.2d 711, 713 (La. 1978).
Plaintiffs have raised and argued a factual cause of action beyond Dr. Young's mere failure to perform a pre-operative myelogram. Their cause of action has not prescribed.

DECREE
The trial court's judgment is reversed and judgment is rendered overruling the exceptions of prescription. Costs here and below are assessed against appellees, Dr. Young and his liability insurer.
REVERSED, RENDERED, AND REMANDED.
HIGHTOWER, J., dissents and assigns written reasons.
HALL, C.J., dissents.
HIGHTOWER, Judge, dissenting.
The majority lodges heavy reliance in Whitnell v. Menville, supra. There, plaintiffs' arguments asserted two totally different alternative theories of recovery: One grounded on defendant's violation of his duty of care toward the injured party, and the other based on an infraction of his fiduciary duty to that party. The latter theory maintained that the physician, even after correctly performing a diagnosis, had not informed his patient. Since that assertion might interrupt prescription by bringing forth the doctrine of contra non valentem, plaintiffs were accorded the opportunity to amend their petition to possibly overcome the exception.
We have no such alternative theory of recovery in our present case.
As the trial court correctly observed, the facts known by plaintiffs in October of 1974 reasonably alerted them that the possible cause of the paralysis was the insertion of the Harrington rod, and that they might have a cause of action against Dr. Young, who had performed that surgery. As we observed in Maung-U v. May, 556 So.2d 221 (La.App. 2d Cir.1990):
Prescription does not run only as long as it is reasonable for the plaintiff not to recognize that the condition "may" be related to treatment. When a plaintiff has knowledge of facts strongly suggestive that the untoward condition or result may be the result of improper treatment and there is no effort by the health care providers to mislead or cover up information which is available to plaintiff through inquiry or professional medical or legal advice, then the facts and cause of action are reasonably knowable to the plaintiff. Inaction by the plaintiff for *728 more than a year under such circumstances is not reasonable.
In effect, the majority concludes that until the specific injury-causing act or mechanism is defined, prescription does not begin to run. I respectfully dissent.

ON APPLICATION FOR REHEARING
Before MARVIN, FRED W. JONES, HIGHTOWER, HALL and SEXTON, JJ.
Rehearing denied.
NOTES
[1] The doctors provided these definitions:

Spina bifida: A lack of bony elements in an area of the spine which leaves the spinal canal and its contents exposed.
Diastematomyelia: A spinal abnormality characterized by widening of the spinal cord and a bony or ligamentous spur, which causes the spinal cord to actually split in half and develop around the area.