STATE OF LOUISIANA

COURT OF APPEAL, THIRD CIRCUIT

03-791

BRENDA SUE CARTER, ET UX.

VERSUS

GARY STEPHEN HAYGOOD, DDS, ET AL.

**********
APPEAL FROM THE
SEVENTH JUDICIAL DISTRICT COURT
PARISH OF CONCORDIA, NO. 35,998
HONORABLE KATHY A. JOHNSON, DISTRICT JUDGE
**********

GLENN B. GREMILLION
JUDGE

**********

Court composed of Billie Colombaro Woodard, Glenn B. Gremillion, and Elizabeth A. Pickett, Judges.

AFFIRMED IN PART; REVERSED IN PART; AND RENDERED.

Anne Elizabeth Watson
232 N. Liberty Street
Opelousas, LA 70570
(337) 942-9790
Counsel for Plaintiff/Appellee
    Charles Carter
    Brenda Sue Carter


Joseph Rodney Messina
256 East Blvd.
Baton Rouge, LA 70802
(225) 343-9422
Counsel for Plaintiff/Appellee
    Charles Carter
    Brenda Sue Carter

**James A. Bolen, Jr.**
**Bolen, Parker, & Brenner, LTD.**
**P. O. Box 11590**
**Alexandria, LA 71315-1590**
**(318) 445-8236**
**Counsel for Defendant/Appellant**
      **Gary Stephen Haygood, DDS**
      **Medical Protective Company**

**Donna J. Duplechian**
**Bolen, Parker & Brenner, LTD.**
**P. O. Box 11590**
**Alexandria, LA 71315-1590**
**(318) 445-8236**
**Counsel for Defendant/Appellant**
      **Gary Stephen Haygood, DDS**
      **Medical Protective Company**

GREMILLION, Judge.

The defendant, Dr. Gary Haygood, DDS, and his insurer, The Medical Protective Company (collectively referred to as Dr. Haygood), appeal the judgment of the trial court finding in favor of the plaintiffs, Brenda and Charles Carter, in this dental malpractice case. For the following reasons, we affirm in part; reverse in part; and render.

**FACTS**

Brenda first saw Dr. Haygood on June 25, 1996, to obtain an estimate on a dental plate. During the examination, they discussed correcting her overbite. At her second appointment on July 11, 1996, it was agreed that Dr. Haygood would extract a number of Brenda's teeth and fit her with top and bottom partial dentures (partials). On August 30, 1996, Dr. Haygood extracted eleven teeth and then fitted Brenda with metal-based, permanent partials made from impressions taken of her teeth at her previous visit. She returned for adjustments to the partials several times. Based on her complaints, Dr. Haygood replaced the metal partials with semi-permanent acrylic partials on September 12, 1996. Brenda returned for adjustments to these partial on September 30, and October 9, 1996. On January 6, 1997, Dr. Haygood recommended that she have the partials realigned at a cost of $150 per partial. The realigns were performed, but Brenda understood the price to be $150 for both partials. She never paid either amount. Later that day, Charles called and told Dr. Haygood that they had already paid over $2,000 for the work performed, and they did not feel like they should have to pay more for the realigns. Although Brenda later tried to schedule appointments with Dr. Haygood for adjustments to her partials, he refused to see her

1

and recommended that she seek help elsewhere.

On December 18, 1997, Brenda filed a medical malpractice complaint against Dr. Haygood with the Division of Administration based on his deviation from the normal standard of care. On March 3, 1999, the Medical Review Panel rendered an opinion finding that "the evidence does not support the conclusion that Dr. Gary Stephen Haygood failed to meet the applicable standard of care as charged in the complaint."

On April 28, 1999, the Carters filed suit against Dr. Haygood, the State of Louisiana Patient Compensation Fund, and ABC Insurance Company seeking general, special, and loss of consortium damages based on the negligence of Dr. Haygood. They filed an amending and supplemental petition naming The Medical Protective Company, Dr. Haygood's malpractice insurer, as defendant. In his answer to this petition, Dr. Haygood requested a trial by jury. Upon the filing of a Dilatory Exception of Prematurity by the Patient's Compensation Fund, the Carters and the Fund filed a Joint Motion for Partial Dismissal dismissing their suit against the fund without prejudice. Thereafter on December 1, 1999, Dr. Haygood filed a Motion for Summary Judgment arguing that the pleadings and attachments demonstrated that there were no genuine issues of material fact. After a hearing on the motion, the trial court denied the motion for summary judgment.

On July 6, 2000, Dr. Haygood filed a Second Motion for Summary Judgment. Following a hearing on the motion, the trial court granted judgment in favor of Dr. Haygood and dismissed the Carters' claims with prejudice. A judgment was rendered on October 30, 2000. On November 7, 2000, the Carters filed a Motion

for New Trial alleging that the trial court erroneously granted the summary judgment in favor of Dr. Haygood. On January 31, 2001, the trial court granted the motion in favor of the Carters. Dr. Haygood sought supervisory writs on this decision from this court. On May 14, 2001, we denied the writ finding no error in the trial court's ruling. Unpublished writ No. 01-367 (La.App. 3 Cir. 5/14/01). Although Dr. Haygood applied for writs to the Louisiana Supreme Court, that application was not considered as it was filed untimely. *Carter v. Haygood*, 01-1763 (La. 9/28/01), 797 So.2d 682.

Brenda filed a Motion to Convert Jury Trial to Bench Trial, arguing that her damages did not exceed the $50,000 jury trial jurisdictional amount. Thus, the matter was converted to a bench trial. Dr. Haygood then filed a peremptory exception of prescription.

The hearing on the exception of prescription was held prior to the start of the trial on the merits. Dr. Haygood argued that the Carters' claims had prescribed since Brenda filed her medical malpractice claim with the Patient's Compensation Fund more than one year after the extraction of the eleven teeth. After hearing argument on this issue, the trial court denied Dr. Haygood's exception and the matter proceeded to trial. After the close of evidence, the trial court took the matter under advisement. It then issued written reasons finding in favor of the Carters and awarding them damages as follows: $22,000 in general damages, $13,616 in special damages, and $3,000 for loss of consortium. Judgment was rendered in this matter on February 14, 2003. This appeal by Dr. Haygood followed.

3

On appeal, Dr. Haygood raises five assignments of error. He argues that the trial court erred in reversing its ruling on his motion for summary judgment and in denying his exception of prescription. He further argues that the trial court erred in finding him liable to the Carters and in awarding Brenda future medical expenses and excessive general damages.

**SUMMARY JUDGMENT**

In his first assignment of error, Dr. Haygood argues that the trial court erred in reversing its judgment granting summary judgment in his favor since the Carters failed to introduced any further evidence as part of their motion for a new trial. However, the record is devoid of any evidence pertaining to either Dr. Haygood's motion for summary judgment or the Carters' motion for a new trial.

The record does not contain a transcript of either hearing, although the judgments pertaining to both indicate that hearings were held in each matter. It contains no minute entries pertaining to the hearings on the motion for summary judgment or the motion for new trial, which would indicate the introduction of evidence at either hearing. All that we have are the judgments rendered in each matter, which indicate that briefs were submitted in support of and in opposition to each motion. However, those briefs and their attachments were not introduced into the record.

In *Our Lady of the Lake Hosp. v. Vanner*, 95-754, pp. 3-5 (La.App. 1 Cir. 12/15/95), 669 So.2d 463, 465, the court stated:

> Pursuant to LSA-C.C.P. art. 2164, an appellate court must render its
> judgment upon the record on appeal. The record on appeal is that which

is sent by the trial court to the appellate court and includes the pleadings, court minutes, transcript, jury instructions, judgments and other rulings, unless otherwise designated. LSA-C.C.P. arts. 2127 and 2128; Official Revision Comment (d) for LSA-C.C.P. art. 2127. An appellate court cannot review evidence that is not in the record on appeal and cannot receive new evidence.

. . . .

. . . Ordinarily, the inadequacy of a record is imputable to the appellant. *State ex rel Gust v. Thompson*, 532 So.2d at 527. However, the inadequacy of an appellate record for which an appellant is responsible cannot operate to the detriment of an appellee. *State ex rel. Gust v. Thompson*, 532 So.2d at 527. Thus, if evidence was introduced at the hearing on the exception and the appellant failed to transmit a complete record to this court, this inadequacy cannot be used to reverse the judgment in favor of the appellees. *State v. ex rel. Gust v. Thompson*, 532 So.2d at 527.

Considering the lack of a record on this issue, we find that Dr. Haygood has failed to prove that the trial court erred in reversing its decision on his motion for summary judgment and in granting the Carters a new trial. This assignment of error is dismissed as being without merit.

## PRESCRIPTION

In his second assignment of error, Dr. Haygood argues that the trial court erred in denying his peremptory exception of prescription. For the following reasons, we affirm in part and reverse in part.

Louisiana Revised Statute 9:5628(A) provides the prescriptive period pertaining to medical malpractice claims:

No action for damages for injury or death against any . . . dentist . . . whether based upon tort, or breach of contract, or otherwise, arising out of patient care shall be brought unless filed within one year from the date of the alleged act, omission, or neglect, or within one year from the date of discovery of the alleged act, omission, or neglect; however, even as to claims filed within one year from the date of such discovery, in all events such claims shall be filed at the latest within a period of three

years from the date of the alleged act, omission, or neglect.

In *Medical Review Panel for Claim of Moses*, 00-2643, pp. 7-8 (La. 5/25/01), 788 So.2d 1173, 1178-79 (emphasis added), the supreme court stated:

> La.Rev.Stat. 9:5628 is a tripartite prescription provision.
>
> First, a one-year prescription period (which parallels the general tort period) is the general rule, which applies to all types of medical malpractice actions. Under this general rule, such actions prescribe one year from the date of the alleged act, omission or neglect. This rule applies when the damages are **immediately apparent**.
>
> Second, in cases involving damages that are not immediately apparent, a discovery exception to the general rule is codified. The discovery exception embodied in Section 5628 is a codification of the fourth category of *contra non valentem* for cases in which the cause of action is not immediately knowable. Under this discovery rule, such actions prescribe one year from the date of discovery of the alleged act, omission or neglect.
>
> Third, an overall limitation is placed on cases otherwise falling within the discovery rule. That overall limitation is the underscored portion of Section 5628, which provides that "*in all events such claims shall be filed at the latest within a period of three years from the date of the alleged act, omission or neglect.*" La.Rev.Stat. 9:5628 (emphasis supplied). Translated, this means that "the *contra non valentem* type of exception to prescription embodied in the discovery rule is expressly made inapplicable after three years from the alleged injury causing act, omission or neglect." *Boutte v. Jefferson Parish Hospital Service District No. 1*, 99-2402 at p. 5 (La.4/11/00), 759 So.2d 45, 49. "Superimposed upon [the discovery rule], however, is an overall limitation upon the discovery rule's operation to a period of three years from the date of the alleged act, omission or neglect." *Branch v. Willis-Knighten Medical Center*, 92-3086 at p. 17 (La.4/28/94), 636 So.2d 211, 216.

The law pertaining to the commencement of prescription in medical malpractice cases was set out by the supreme court in *Campo v. Correa*, 01-2707, pp. 11-12 (La. 6/21/02), 828 So.2d 502, 510-11:

> Prescription commences when a plaintiff obtains actual or constructive knowledge of facts indicating to a reasonable person that he

6

or she is the victim of a tort. *Percy v. State, E.A. Conway Memorial Hosp.*, 478 So.2d 570 (La.App. 2 Cir.1985). A prescriptive period will begin to run even if the injured party does not have actual knowledge of facts that would entitle him to bring a suit as long as there is constructive knowledge of same. Constructive knowledge is whatever notice is enough to excite attention and put the injured party on guard and call for inquiry. Such notice is tantamount to knowledge or notice of everything to which a reasonable inquiry may lead. Such information or knowledge as ought to reasonably put the alleged victim on inquiry is sufficient to start running of prescription. *Ledet v. Miller*, 459 So.2d 202 (La.App. 3 Cir.1984), *writ denied*, 463 So.2d 603 (La.1985); *Bayonne v. Hartford Insurance Co.*, 353 So.2d 1051 (La.App. 2 Cir. 1977); *Opelousas General Hospital v. Guillory*, 429 So.2d 550 (La.App. 3 Cir.1983). Nevertheless, a plaintiff's mere apprehension that something may be wrong is insufficient to commence the running of prescription unless the plaintiff knew or should have known through the exercise of reasonable diligence that his problem may have been caused by acts of malpractice. *Gunter v. Plauche*, 439 So.2d 437, 439 (La.1983). Even if a malpractice victim is aware that an undesirable condition has developed after the medical treatment, prescription will not run as long as it was *reasonable* for the plaintiff not to recognize that the condition might be treatment related. *Griffin v. Kinberger*, 507 So.2d 821 (La.1987). The ultimate issue is the *reasonableness* of the patient's action or inaction, in light of his education, intelligence, the severity of the symptoms, and the nature of the defendant's conduct. *See Griffin*, 507 So.2d at 821.

Moreover, jurisprudence does not require that a patient learn of the possible malpractice from an attorney or other medical practitioner before prescription commences running. *Parker v. Dr. X*, 97-841 (La.App. 3 Cir. 12/10/97), 704 So.2d 373 (quoting *Gassen v. East Jefferson Gen. Hosp.*, 96-590 (La.App. 5 Cir. 12/30/96), 687 So.2d 120, 123-24, *writ denied* 97-0738 (La. 5/1/97), 693 So.2d 735, which quotes *Harlan v. Roberts*, 565 So.2d 482, 486 (La.App. 2 Cir.), *writ denied*, 567 So.2d 1126, (La.1990)).

If evidence is introduced at the hearing on the peremptory exception of prescription, the trial court's findings of fact are reviewed under the manifest error—clearly wrong standard of review. *Perez v. Trahant*, 00-2372 (La.App. 1 Cir.

7

12/28/01), 806 So.2d 110, *writs denied*, 02-0847, 02-0901(La. 8/30/02), 823 So.2d 953. In this instance, evidence was introduced at the hearing on the exception of prescription, which was held just prior to the trial on the merits. However, since Dr. Haygood has assigned the trial court's denial of his exception of prescription as error on appeal, we will consider the record in its entirety in reviewing this issue. *Senn v. Bd. of Supervisors*, 28,599 (La.App. 2 Cir. 8/21/96), 679 So.2d 575, *writ denied*, 96-2344 (La. 10/25/96), 681 So.2d 379; La.Code Civ.P. art. 2163.

In this instance, we find that the trial court committed legal error in denying Dr. Haygood's peremptory exception of prescription as it pertained to the extraction of the eleven teeth, but not as to the claim that he failed to diagnose Brenda's gum disease.

In their petition, the Carters alleged:

12.
It is alleged herein that the defendant was negligent in failing to diagnose Carter's gum disease, failing to properly treat her gum disease and failing to refer her to a periodontist for treatment of her gum disease.

13.
Petitioner Carter asserts that defendant Haygood is further more negligent in failing to attempt non-surgical treatment before extracting eleven (11) of her teeth.

Brenda testified that Dr. Haygood told her during her second examination on July 11, 1996, that he could correct her overbite by pulling a couple of teeth, pushing her teeth back, and then replacing the extracted teeth with an upper partial and a new bottom partial. She then inquired as to the need for braces to correct her overbite. Brenda agreed to have the upper and lower partials made, after he responded that she did not require them. She denied telling Dr. Haygood that she wanted the

8

work performed quickly because she was going on a cruise. However, she did state that she told Shirley Martin, his hygienist, about a cruise she was taking in September.

Brenda stated that her teeth were pulled on August 11, 1996. After being anaesthetized, she remembered hurting and yelling. She recalled that Dr. Haygood was straddling her, while Martin held her head, and that he was pulling and saying, "It won't let go." Once the tooth let go, she stated it felt as though her face had caved in on one side. She stated that Dr. Haygood then said, "That's it." Once the extractions were completed, Brenda testified that Dr. Haygood put the partials in and that it felt as though her mouth was wall to wall teeth.

Brenda stated that she returned to Dr. Haygood several times due to her dissatisfaction with her partials. She stated that she was unable to open her mouth because the partials were too big and that she had trouble taking them out of her mouth. She said that she lost thirteen pounds over two weeks, as a result of her inability to eat, and that she garbled when she spoke. Each time she complained , she testified that Dr. Haygood or Martin told her, "Its going to be okay. Hang in there, we're going to get it right." She stated that Dr. Haygood did not see any problem with the partials.

Brenda testified that she told Dr. Haygood that she was going on vacation and that she wanted to be able to eat. She stated that he said he would provide her with a temporary fix and he did new impressions of her upper and lower teeth, from which acrylic partials were made. Brenda stated that these fit better, but that she had no chewing or grinding ability with them. While on vacation, she testified that she

9

noticed green pus draining out of a cavity left by an extracted tooth. When she returned home, she tried to contact Dr. Haygood, but his office was closed. She then contacted Dr. Marshall Hawkins' office and spoke to a receptionist, who explained that the extraction of the tooth had caused an opening into a sinus cavity, for which she was prescribed an antibiotic. She stated that she told Dr. Haygood this the next time she saw him, but that he failed to acknowledge this information.

Brenda testified that she understood that this set of partials was only temporary, and that Dr. Haygood would be providing her with a permanent set. She stated that he made adjustments to these partials whenever she returned to him, but she still had problems with her gums, which were bleeding from the partials pushing into them. She said that Dr. Haygood never told her that the bleeding was caused by gingivitis. Brenda last saw Dr. Haygood on January 6, 1997, at which time she complained that her partials did not fit and that her permanent teeth were chipping at the location where the partials attached to those teeth. She stated that Dr. Haygood never acknowledged the problems she was having, but told her that he could adjust the partials or that they could be realigned by the laboratory at a cost of $150. She elected to have the partials realigned. However, Brenda stated that she was later told by his receptionist that the amount was $150 per partial, rather than a total of $150. She disputed this amount and never paid it.

Brenda testified that she continued having problems with the partials and that she tried several times to schedule appointments with Dr. Haygood, but that he would not see her. She further stated that she tried to obtain her medical records from him on several occasions and only obtained them after she filed her claim and Dr.

10

Haygood was deposed. She testified that she paid $2,100 for the partials, the extractions, and the other work performed by him.

Although Brenda knew that a number of teeth had been extracted, she testified that she only learned that eleven had been extracted on September 3, 1996. On that date, she stated that Dr. Haygood told her that he had pulled more teeth than he originally intended. Brenda testified that she told Dr. Haygood that she had not consented to this and that she was not aware he was going to pull that many teeth. She stated that she complained to his staff every time she went to his office that she was not aware he was going to pull eleven teeth.

Brenda further testified that Dr. Haygood never told her that she was suffering from pyorrhea, also known as gum disease, nor did he or his staff use a periodontal probe on her to determine whether she was suffering from the disease. She stated that she continued seeing him because she trusted him and because he kept telling her that he was going to get it right. Brenda admitted that she had been seen by four other dentists at various times prior to seeing Dr. Haygood.[1] Although she stated that at least three of these dentists extracted teeth from her, she claimed that none informed her that she was suffering from gum disease.

After Dr. Haygood refused to see her and failed to release her medical records, Brenda testified that she retained an attorney to file a claim. Although she knew there was a problem, she stated that she waited two years and two months to

_____

[1] Brenda testified that a Dr. Castleberry pulled some of her teeth when she was a teenager. She was next seen by a Dr. Fairbanks. Brenda next saw Dr. Hawkins beginning in May 1993. His records reveal that Brenda was already missing six teeth when he first examined her. Between May 1993 and October 1993, he extracted three teeth due to decay. Brenda next saw Dr. Gerald DeLaune beginning on January 2, 1996. His records reveal that he extracted two teeth due to decay and prescribed Peridex for her general gum disease.

11

have her teeth fixed because she could not afford to do so sooner.  She further stated that she waited that long because she expected Dr. Haygood to release her records, admit to what he had done, and to correct her problems.  She stated that she and her husband eventually refinanced their home in order to have her teeth fixed.

Charles testified that he contacted Dr. Haygood twice concerning Brenda's treatment.  On the second occasion, he stated that Dr. Haygood told him that he was referring Brenda to a Dr. Taunton due to a conflict between them.  He further testified that Dr. Haygood, before hanging up, told him that Brenda was suffering from gum disease.  He stated that this was the first that she learned that she was suffering from gum disease.

Dr. Haygood testified that Brenda originally wanted an estimate for a full dental plate, but that he discouraged her from full dentures because of the "Class 2" orthodontic situation resulting from her protrusive bone structure and teeth.[2]  In his examination, he noted a general breakdown of her teeth, generalized pyorrhea, bone loss, and gingival or gum irritation.  He found that her posterior teeth had not only boned out, but were also decayed.  She further had a collapsed occlusion on the upper right side such that those teeth had grown down and were nearly touching the lower ridge on the right side of her mouth.  Because of this collapsed occlusion, and because so many of her teeth had flared and drifted, Dr. Haygood stated that Brenda could not chew food properly and had almost no bite.  He testified that he told her during his examination that she had pyorrhea.

---

[2] Full dentures require the extraction of all teeth.

12

Dr. Haygood stated that Brenda wished to esthetically improve her mouth by eliminating her buck-toothed appearance and that she wanted it done quickly and inexpensively before she went on a cruise. After examining her mouth and the x-rays, he determined which teeth to pull in order to achieve her desired result. He stated that he then told her that he could improve her appearance by pulling her teeth in and improving her chewing ability. By removing her bad teeth, he stated that could remove the poison in her system caused by the decayed teeth. Dr. Haygood testified that he ultimately recommended the extraction of nine teeth, but that Brenda added two more posterior teeth which were decayed, rather than put fillings into them. He stated that he would have preferred to fill the teeth or preform root canals on them.

Once Dr. Haygood obtained Brenda's consent for the proposed treatment, he stated that impressions were made of her upper and lower teeth and sent to the laboratory so the partials could be fabricated containing the teeth that were to be extracted. At this examination, Brenda's teeth were cleaned, a bite-wing x-ray was taken, an occlusal equilibration was performed, and she selected her tooth color. He stated that he did not perform deep scaling or curetting of her gums because a cleaning was all that was required to treat her gum disease. When they finalized plans on July 11, 1996, to extract eleven teeth, Dr. Haygood stated that Brenda never objected to extracting that many teeth. Had she done so, he stated that he would not have removed any teeth. He further testified that she was already missing eleven teeth at the time he examined her.

On August 11, 1996, Dr. Haygood extracted the eleven teeth from

13

Brenda, who had been anaesthetized with nitrous gas, as well as having her teeth and gums numbed. Dr. Haygood stated that the teeth were easily extracted due to her irritated gums and loss of bone, and that the whole procedure took only thirty to forty-five minutes. He denied that Brenda was in pain or that she moaned in pain during the procedure. He testified that the ease of extraction confirmed his determination that her teeth were bad and needed to be removed. He further stated that none of the extracted teeth were close to her sinuses, thus, she did not suffer an opening into her sinus cavities after the extractions. He stated that Brenda never complained, either before or after the extractions, that she did not want eleven teeth pulled.

Brenda returned to Dr. Haygood several times for adjustments to her partials. On September 11, 1996, Dr. Haygood testified that Brenda complained that her partials did not pull her teeth in far enough, that she was blowing bubbles underneath them, and that she thought she was allergic to their metal base. Since she was unhappy, he testified that he made new impressions of her teeth and had new semi-permanent partials made for her at no charge. He stated that these partials were made from acrylic, rather than the metal-based permanent partials she originally chose. Dr. Haygood stated that Brenda was pleased with the partials after they were inserted into her mouth.

Adjustments were made to the partials on September 30, 1996, and October 9, 1996. Dr. Haygood testified that Brenda never complained about them. On January 6, 1997, she told him that her partials were too loose. He stated that he recommended that the partials be sent to the laboratory to be realigned at a cost of $150 per partial. Although she agreed to this and the partials were realigned, he stated

14

that she never paid this amount. After this, when she called to schedule another appointment, he refused to see her.

With regard to her records, Dr. Haygood admitted that Brenda requested her medical records, but stated that they had been misplaced during the transition of his office from Vidalia, Louisiana, to Natchez, Mississippi. Once he located them, he stated that he turned them over to her attorney.

After reviewing[3] the record, we find that Brenda's claim against Dr. Haygood, that he was negligent in extracting eleven of her teeth without her consent, has prescribed. The extraction of a tooth is an act which is immediately apparent. Dr. Haygood extracted Brenda's teeth on August 30, 1996. Pursuant to La.R.S. 9:5628(A), a one year prescriptive period applies to toll prescription one year from the date of the alleged negligence. In this case, prescription should toll on Brenda's claim that Dr. Haygood negligently extracted her teeth without her permission on September 2, 1997. Brenda did not file her medical malpractice claim until December 18, 1997. Thus, her claim has prescribed.

Brenda testified that she did not learn that eleven teeth had been extracted until September 3, 1996. Thus, under the discovery exception to the general rule of prescription, as stated in La.R.S. 9:5628(A), prescription would commence running on September 3, 1996, and would toll on September 3, 1997, more than one year prior to the filing date of her medical malpractice claim on December 18, 1997. Again, her claim has prescribed.

Brenda further testified that she did not file her medical malpractice claim

---

[3] August 30, 1997 was a Saturday, and September 1, 1997 was Labor Day. Therefore, prescription tolled on September 2, 1997. La.Civ.Code art. 3454.

15

until December 18, 1997, because she expected Dr. Haygood to admit to his negligence and to correct the problems that he either caused or allowed to continue. She testified that she first suspected that something was wrong when he refused to continue treating her subsequent to her January 6, 1997 appointment. She further stated that, although she knew that Dr. Haygood had extracted eleven teeth as early as September 3, 1996, she continued treating with him because she trusted him and because he continually told her that he would correct her problems.

In *Medical Review Panel for Claim of Moses*, 788 So.2d at 1180, the supreme court stated:

> We recently held that "for there to be a continuing tort there must be a continuing duty owed to the plaintiff and a continuing breach of that duty by the defendant. 54 C.J.S. *Limitations of Actions* § 177 (1987)." *Crump*, 98-2326 at p. 10, 737 So.2d 728. Rejecting the contention that the continuing breach of duty could consist of the defendant's failure to remedy the harm caused by the initial tortious conduct, we stated that "the breach of the duty to right a wrong and make the plaintiff whole simply cannot be a continuing wrong which suspends the running of prescription, as that is the purpose of any lawsuit and the obligation of every tortfeasor." 98-2326 at p. 10, 737 So.2d at 729. An exception, however, has been recognized when a special relationship, such as patient-physician or attorney-client, exists between the parties; the continuation of a special relationship offers the possibility of correction of an injury and thus may postpone the running of prescription. 54 C.J.S. *Limitations of Actions* § 177 (1987). "As long as the patient remains in [the physician's] care, she could reasonably expect a correction of the diagnosis or treatment, so again, the defendant in a sense continues to be negligent." *Dobbs, supra* § 220 at 561.

> In *Taylor v. Giddens*, 618 So.2d 834 (La.1993), we noted the possibility that continued treatment combined with a continued professional relationship could result in a suspension of prescription. We further noted that two appellate cases have recognized this principle, which is based on the fact the continuing relationship is "likely to hinder the patient's inclination to sue." 618 So.2d at 843 (citing *Trainor v. Young*, 561 So.2d 722 (La.App. 2d Cir.), *writs denied*, 567 So.2d 1124, 1125 (La.1990), and *Abrams v. Herbert*, 590 So.2d 1291 (La.App. 1st Cir.1991)). Because the record before us in *Taylor* revealed that the

16

malpractice victim's relationship with the doctor was no more than "perfunctory," we declined to address the issue of whether prescription could be suspended based on the doctor's continued treatment of the patient.

As a matter of semantics, Louisiana appellate courts have indicated that this type of tolling of prescription that possibly arises out of the continuation of such a special relationship is not based on the continuing tort concept; rather, it is based on the third category of *contra non valentem*–where the defendant himself has done some act effectively preventing the plaintiff from availing himself of his cause of action. *See Wang v. Broussard*, 96-2719 (La.App. 1st Cir.2/20/98), 708 So.2d 487, *writ denied*, 98-1166 (La.6/19/98), 720 So.2d 1213 (citing *Succession fo Smith v. Kavanaugh, Pierson and Talley*, 565 So.2d 990, 995 (La.App. 1st Cir.), *writ denied*, 567 So.2d 1125 (La.1990)); *see also Acosta v. Campbell*, 98-2538 (La.App. 4th Cir.8/11/99), 744 So.2d 112, *writ denied*, 99-2651 (La.11/19/99), 749 So.2d 683 (noting that no Louisiana case has held that prescription can be extended solely, or primarily, because of continued relationship and describing this argument as falling squarely within third category).

Thus, the supreme court has stopped short of finding that the continuing relationship between a doctor and his patient will suspend the running of prescription on an alleged malpractice claim. However, we find that the continuing relationship between Brenda and Dr. Haygood did not stop the running of prescription on her claim that he negligently extracted eleven teeth without her permission. In this instance, Brenda had actual knowledge that the teeth were extracted as early as September 3, 1996. She stated that she questioned Dr. Haygood about the extractions, she told him that she had not consented to the extraction of that many teeth, and she expressed her dissatisfaction to his staff at every appointment. This is not a case where the patient remained ignorant of the malpractice until after the termination of the doctor-patient relationship. *See Acosta v. Campbell*, 98-2538 (La.App. 4 Cir. 8/11/99), 744 So.2d 112, *writ denied*, 99-2651 (La.11/19/99), 749 So.2d 683; *Kavanaugh v. Edwards*, 32,413 (La.App. 2 Cir. 12/8/99), 749 So.2d 824, *writ denied*,

17

00-0620 (La. 5/5/00), 761 So.2d 543. Nor do we find that fact that she was unable to obtain her medical records until after her claim was filed sufficient to suspend the running of prescription. Brenda had actual knowledge of the alleged act of malpractice. As stated earlier, it is not necessary that Brenda learn of the possible act of malpractice from an attorney or another dentist. *Parker*, 704 So.2d 373. Moreover, Brenda has taken action in the past when she disputed the $300 charge for the realigns. Accordingly, we find no merit in her claim that the prescriptive period was suspended until January 6, 1997. Thus, this claim has prescribed. The judgment of the trial court is reversed on this issue.

However, we do not find that Brenda's claim that Dr. Haygood failed to properly diagnose and treat her gum disease has prescribed. The failure to properly treat does not contemplate a damage which is readily apparent, thus, the discovery exception embodied in La.R.S. 9:5628 applies to toll prescription of this claim one year from the date of Brenda's discovery of this alleged negligence or within three years from the date the alleged negligence occurred. Brenda filed her medical malpractice claim against Dr. Haygood on December 18, 1997, which was within one year of when she testified that she first learned that she was suffering from gum disease. Furthermore, it was within three years of when the failure to treat actually occurred. Although there was evidence that Brenda was treated for gum disease by a previous treating dentist, we cannot say that the trial court was manifestly erroneous in holding that she did not have constructive notice of this claim until January 1997. The judgment of the trial court is affirmed as to this finding.

## MEDICAL MALPRACTICE

18

We next turn to Dr. Haygood's assignment of error in which he argues that the trial court erred in finding him liable to the Carters. After reviewing the record, we find error in the trial court's judgment and reverse.

In a malpractice case against a dentist, La.R.S. 9:2794(A) provides that the plaintiff shall prove:

(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by . . . dentists . . . licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by the . . . dentists. . . within the involved medical specialty.

(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.

(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.

Thus, in order to sustain an award of damages, the Carters must establish the requisite standard of care with regard to the diagnosis and treatment of gum disease; that Dr. Haygood breached this standard of care; and that there was a causal connection between the breach and the injury suffered by Brenda. *Pfiffner v. Correa*, 94-0924, 94-0963, 94-0992 (La. 10/17/94), 643 So.2d 1228.

The Carters claim that Dr. Haygood failed to perform any diagnostic testing in order to diagnose Brenda's gum disease. Their main argument is that he failed to use a periodontal probe in order to chart her gums to determine whether she was suffering from periodontal or gum disease. After reviewing the record in its

19

entirety, we find that they failed to establish that Dr. Haygood breached the standard of care required of dentist in his locale in the diagnosis of gum disease.

Periodontal disease is a general term covering periodontitis, the loss of bone, and gingivitis, gum disease. Pyorrhea is also a general term including gum disease or gingivitis. Periodontal charting is the use of a periodontal probe to determine pocket depth between the teeth and gums. The greater the pocket depth, the greater the indication of periodontal disease.

Four dentists testified via depositions with regard to the standard of care in the diagnosis of gum disease via periodontal charting: Drs. William Bolton, James Iverstine, Gerald DeLaune, and Marshall Hawkins. All four testified that periodontal charting is one technique in which periodontal disease may be detected. Other means of detecting it are x-rays and visual signs. Drs. Iverstine and Bolton both stated that periodontal charting is the best way to diagnose periodontal disease, however, Dr. Iverstine testified that the failure to do so would not result in malpractice.

Dr. Bolton testified that a dentist would deviate from the standard of care if he did not use a probe to diagnose and evaluate a patient for gum disease. However, he stated that probing would not be required in the case of severe bone loss, which x-rays reveal. He stated that probing is mainly used to obtain an early diagnosis of the disease, since moderate bone loss or early periodontal disease might not be revealed on an x-ray. He further stated that there are visual signs of gum disease, bleeding gums, the presence of pus, and the color of the gums, which can be noted without probing.

Dr. DeLaune stated that periodontal charting is recommended to

20

determine the presence of periodontal disease, along with x-rays, probing, and visual signs. He stated that the means to diagnose the disease is determined by the dentist, depending on the symptoms presented by the patient.

Dr. Hawkins testified that it is not mandated by the dental profession that a dentist perform periodontal probing. He stated that he rarely does periodontal probing, instead, he uses an "A.P.S.R.," in which an A.P.S.R. score is obtained if a patient's gums bleed.[4] He further stated that probing would not be required if teeth are in bad shape and can be easily extracted. Dr. Hawkins also testified that he can diagnose gingivitis by looking at a patient's mouth and by determining bone height, crown/root ratios, the amount of root around a tooth, the positioning of the tooth, and the decay present. Some of these are obvious on x-rays, while some he determines based on his clinical judgment.

After reviewing the testimony of these four dentists, we find that the standard of care required of a dentist in the diagnoses of periodontal disease would depend upon the severity of the symptoms presented by the patient at the time of the examination. If the patient presents with severe, obvious periodontal disease, then it may be diagnosed based on x-rays and the dentist's clinical examination of the patient. Only Dr. Bolton stated that the failure to do such charting would fall below the standard of care, however, he qualified this statement by stating that periodontal probing would not be required in the case of severe bone loss, which can be determined by x-ray. We note that Dr. Bolton practices in Monroe, Louisiana, a much larger city located approximately ninety miles north of Vidalia, Louisiana. As such,

---

[4] In his deposition, Dr. Hawkins did not explain what constitutes an "A.P.S.R."

21

we find that Dr. Bolton does not practice dentistry in the same locale as Dr. Haygood. Although periodontal charting may be recommended, we find that it is not required in all instances.

In this instance, Dr. Haygood testified that he did not perform periodontal probing on Brenda because it was not indicated in her case due to her extremely sensitive tissue structure. He stated that he performed a full examination of her upper and lower teeth, that he took a panorex x-ray of her mouth, as well as a periapical x-ray of her two front teeth. Based on his examination and the x-rays, he determined that there was a generalized breakdown of her teeth. As stated above, he noted generalized pyorrhea, bone loss, and gingival or gum irritation. He found that her posterior teeth had not only boned out, but were also decayed. She further had a collapsed occlusion on the upper right side such that those teeth had grown down and were nearly touching the lower ridge on the right side of her mouth. Because of this collapsed occlusion, and because so many of her teeth had flared and drifted, Dr. Haygood stated that Brenda could not chew food properly and had almost no bite.

With regard to Brenda's gums, Dr. Haygood testified that he would classify them as moderate on the teeth which were retained. As to the teeth extracted, he stated that the x-rays revealed that they did not have two to one crown/root ratios, especially the teeth out front, which had moved slightly apart and were flaring at the top and the bottom

Dr. Haygood denied that Brenda was a candidate for referral to either an orthodontist or a periodontist because he stated that he could solve her problems in office and because she wanted the work performed quickly. He stated that the

22

removal of her worse teeth, which were decayed, deep boned-out teeth, rid her of most of her periodontal problems. Once the teeth were extracted, he stated that her pyorrhea was minimized to gingivitis around her remaining teeth, but that she still had some bone loss. Dr. Haygood stated that he eliminated the prognathic or protrusive appearance of her teeth, which had lost bone due to gum disease, so that, if she improved her hygiene, her condition would be very stable. He explained that periodontal surgery is a long and expensive process, and that Brenda's teeth were already elongated from rescission and bone reabsorption. He stated that surgery would have left her teeth looking longer in front than they already were. He further stated that she was not a candidate for orthodontic treatment due to her bone loss. Finally, he testified that Brenda never asked for a referral to an orthodontist.

After reviewing the evidence, we find that the trial court was clearly wrong in finding that Dr. Haygood breached the standard of care required of a dentist in his locale in the diagnosis of periodontal disease. The standard of care does not require a dentist to perform periodontal probing and charting in all instances, and the diagnosis of such disease may be determined based on x-rays, symptoms, and the dentist's clinical judgment. In this instance, Dr. Haygood determined, based on Brenda's symptoms, that periodontal probing was not necessary, and his diagnosis was made based on his x-rays, examination, and his judgment. Accordingly, we find that he did not breach the standard of care by diagnosing her periodontal disease in this manner. The judgment of the trial court is reversed and it is now ordered, adjudged, and decreed that there be judgment in favor of Dr. Haygood and his insurer, The Medical Protective Company.

23

**CONCLUSION**

For the foregoing reasons, the judgment of the trial court pertaining to the motion for summary judgment is affirmed; the judgment of the trial court pertaining to the exception of prescription is reversed in part and affirmed in part; and the trial court's judgment pertaining to the finding of fault on the part of Dr. Haygood is reversed and it is now ordered, adjudged, and decreed that there be judgment in favor of the defendants-appellants, Dr. Gary Haygood and The Medical Protective Company. The costs of this appeal are assessed seventy-five percent to the plaintiffs-appellees, Brenda and Charles Carter, and twenty-five percent to Dr. Haygood and The Medical Protective Company.

**AFFIRMED IN PART; REVERSED IN PART; AND RENDERED.**

24